Ralph Hurst, Plaintiff, v. Stanley Papierz, et al., De-
 fendants.
Robert Rauth, Counterclaimant-Appellant, v. Stanley
 Papierz, et al., Counterdefendants-Appellees.

**Gen. No. 53,331.**

First District, First Division.

September 18, 1970.

Thomas D. Nash, Jr. and Robert M. Ahern, of Chicago, for appellant.

Paul C. Ross and Harry G. Fins, of Chicago, for appellees.

119

**MORAN, P. J.**

This action was initiated by Ralph Hurst to establish his ownership of a one-third interest with Stanley Papierz and Robert Rauth in an apartment project known as the Villa Venice Apartments located in LaGrange, Illinois. Defendant Robert Rauth filed a counterclaim against Stanley Papierz, Theresa Papierz, S. P. Construction, Inc., Stanley Papierz Builders, Inc., LaGrange State Bank, as trustee under Trust No. 180, and Baird & Warner, Inc., asserting a 30% interest as a joint venturer with Stanley Papierz in the same project. The cause was referred to a Master who took evidence and recommended that Hurst's complaint and Rauth's counterclaim be dismissed for failure to prove the material allegations therein. The Chancellor overruled all exceptions to the Master's report and entered a decree dismissing the complaint and counterclaim and assessing costs among all parties. Rauth only appeals from that portion of the decree dismissing his counterclaim. Hurst does not appeal.

In January, 1963, Hurst and Papierz were introduced and discussed the possibility of constructing apartment buildings on one of three land sites proposed by Hurst. The testimony is conflicting as to whether Papierz was to advance a down payment of 5% of the purchase price of the land, or whether he was to advance all capital necessary for deposits on the land, building permits and any other initial costs. Shortly thereafter, Rauth, Papierz's brother-in-law, was invited to participate. At one point the three met in Papierz's attorney's office to discuss the legal aspects and each of their duties with respect to the project. Numerous meetings and phone calls followed, until it was learned that the three original land sites could not be purchased. Hurst and Rauth testified that Papierz agreed to continue the same arrangement with respect to any other suitable property that might be found. Papierz denied this assertion. Some time later Hurst located some ground in LaGrange, Illinois, owned

120

by a man named Eiserman, on which the apartments were eventually built and which is the subject matter of this litigation. All three parties met with Eiserman and negotiated on several occasions before they purchased the property. Eventually, it was agreed in late May or early June to purchase the property for $210,000. Throughout this time, Rauth and Hurst had been spending two or three days each week on preliminary matters in furtherance of the project. The sale was conducted through an escrow with Chicago Title and Trust Company, with Papierz making a down payment of $17,500 with S. P. Construction, Inc. as grantee. Papierz, Rauth and Hurst all signed a written waiver of commission in connection with this sale on June 10, 1963. At the time of the escrow agreement Rauth owned 30% of the stock of S. P. Construction, Inc., and Stanley Papierz and Theresa Papierz, his wife, owned the remainder. This arrangement will be discussed more fully in the course of this opinion.

The Master's Report as it pertains to the dispute between Rauth and Papierz is in pertinent part as follows:

"After Eiserman agreed to sell the LaGrange property for $210,000.00, Eiserman and Papierz further agreed that the sale of the property be through an escrow with Chicago Title and Trust Company as the escrowee and that a down payment of $17,500.00 be made by the parties at the time the escrow was opened; in addition, it was also agreed that Papierz, Hurst and Rauth were to execute written waivers of commission in connection with the LaGrange project. Papierz testified that he told Hurst that he expected him (Hurst) to come up with the balance of the land loan to complete the project after Papierz deposited the required $17,500.00, and that if he did not, it could very well be that the said $17,500.00 would be defaulted. Papierz further testified that

Hurst stated that he would have the balance of the land loan within three days, all of which Hurst denies. Hurst did not come up with the balance of the land loan within the prescribed time and, because of that, Papierz told Hurst his services were no longer needed for this venture and offered Hurst $1,500.00 for the alleged services he rendered which Hurst refused and caused the amended complaint to be filed.

"Between June 1 and June 14, 1963, prior to the date that the escrow was opened with Chicago Title and Trust Company, as escrowee, there was a conference between Papierz and Rauth as to Rauth's alleged interest in the LaGrange site. The testimony is conflicting again because Papierz testified that he offered to sell Rauth thirty per cent of S P Construction Company for $10,000.00 and that if the financing could be handled through S P Construction Company, then Rauth would have a thirty per cent of the LaGrange property; if not, then the arrangement would be off. Theresa Papierz, wife of Stanley Papierz, was present and testified to the same substance. Papierz further testified that Rauth was actually issued a certificate of thirty shares representing thirty per cent of S P Construction Company; that payments for the said certificate were made from time to time by Rauth and that a balance of $675.00 is still unpaid. Rauth's testimony is in direct conflict with Papierz's as Rauth contends there was no such condition placed on his thirty per cent of the LaGrange project as evidenced by his thirty shares of S P Construction Company stock, as the net worth of S P Construction Company was only $30,000.00.

"After the escrow was opened and after it was discovered that Hurst was unable to supply the necessary land loan commitments to pay off Eiserman,

Rauth and Papierz, individually and together, attempted to find land financing; that from June through October, 1963, approximately twenty financial institutions were visited by them in behalf of S P Construction Company. The evidence further disclosed that when Papierz was unable to pay the balance of the land purchase to Eiserman in the sum of $192,500.00 within the time period set forth in escrow due to Hurst's inability to get the necessary land loan financing, Eiserman agreed to various extensions providing Papierz pay the interest for each extension; that extensions for payment were agreed to be paid in October or November, 1963, upon Papierz paying $900.00 interest per month for each monthly extension period, and that Eiserman notified Papierz there would be no further extensions after that time and that he required payment in full or have a default entered.

"The various interest payment checks to Eiserman were paid by Stanley Papierz Builders, Inc., the corporation owned solely by Stanley Papierz and Theresa Papierz. All during this time the evidence further discloses that Rauth, besides attempting to secure financing on behalf of S P Construction Company, spent several days per week in Papierz's office dealing with subcontractors who were desirous of submitting bids on the LaGrange project.
". . ."

Findings of Fact

". . .
"3. That Stanley Papierz and Theresa Papierz, his wife, own all of the stock of Stanley Papierz Builders, Inc. that Stanley Papierz and Theresa Papierz, his wife, own all of the stock of S P Construction Company with the exception of thirty per cent which was sold to Robert Rauth in June, 1963,

123

for $10,000.00; that the net worth of S P Construction Company is valued at approximately $30,000.00.

". . .

"18. That prior to the date of the opening of the escrow the Master finds from the greater weight of the evidence presented, taking into consideration testimony of all the witnesses, that Papierz did offer and did sell Robert Rauth thirty per cent of S P Construction Company for $10,000.00 so that Rauth might have a thirty per cent interest in the La Grange project, providing S P Construction Company would be able to underwrite the financing land loan for the project. No evidence was offered by Rauth that Papierz was to contribute any of his personal assets to finance S P Construction Co., in carrying the LaGrange site—the only evidence was that Rauth was to and did purchase thirty (30) shares of S P Construction Co. stock.

"19. The Master finds that Rauth was issued thirty shares of S & P Construction Company and that payments towards the $10,000.00 were made by Rauth and that a small balance is still unpaid."

In his answer to Rauth's counterclaim, Papierz denies that he entered into an agreement with either Hurst or Rauth, but pleads further that he advised Hurst and Rauth that if they could obtain the necessary financing, he would put up the necessary cash not to exceed 5% of the purchase price and would give Hurst and Rauth an interest of 30% each in the project. Papierz did not attempt to prove this allegation, but instead at trial he testified that Rauth's interest in the project was predicated on the ability of S. P. Construction, Inc. to "swing or handle" the financing of Villa Venice on the strength of its own resources. This defense was never pleaded. Rauth argues that since Papierz did not prove his pleaded defense and since he did not plead the defense which

124

he attempted to prove, that he is now left with no defense at all, relying on the rule that a party cannot avail himself of any manner of defense not stated in the answer, even though it appears in the evidence, citing Jewett v. Sweet, 178 Ill 96, 52 NE 962; Potter v. Fon du Lac Park Dist., 337 Ill 111, 168 NE 908, and other cases. However, Rauth did not initially object to Papierz's testimony concerning this condition and in fact, he rebutted that testimony with his testimony that no such condition existed, with the letter of Mrs. Papierz that they had agreed to submit financial statements, and with the testimony of Maria Grenet that financial statements were prepared in connection with obtaining financing for the project. Consequently, he has not been surprised or prejudiced by this variance and he will be deemed to have waived his objection since this variance could have been corrected by an amended pleading at trial. See Ill Rev Stats 1967, c 110, § 43(4), which states that "the facts constituting any affirmative defense . . . which if not expressly stated in the pleading *would be likely to take the opposite party by surprise,* must be plainly set forth in the answer or reply." (Emphasis added.)

Rauth further contends that the Master erred in holding that he had the burden of proving that his interest in the agreement was conditioned upon S. P. Construction, Inc. being able to underwrite the loan, thus erroneously requiring him to disprove an affirmative defense. The Master found, "Similarly, the burden of proof is upon Rauth to establish his alleged interest in the LaGrange project due to his ownership of 30% of S. P. Construction Company stock. The Master concludes that the testimony of Papierz and Rauth is conflicting, particularly whether Rauth's interest in the project was conditioned upon S. P. Construction Company being able to underwrite its own land loan. In the case at bar, the testimony of Papierz and Rauth are diametrically opposed as to this

125

proviso, consequently, the testimony offered by Rauth is not clear and convincing as to lead to one conclusion."

■ ■ The test of what constitutes an affirmative defense was discussed in Cunningham v. City of Sullivan, 15 Ill App2d 561, 147 NE2d 200. In that case, the court stated: "At common law and under the codes the test of whether a defense is affirmative . . . is whether the defense gives color to the opposing party's claim and then asserts new matter by which the apparent right is defeated. The admission of the apparent right is inferable from the affirmative defense." Applying that test to the case before us, we believe that the defense sought to be proved by Papierz, that the agreement whereby Rauth was to have a 30% interest in Villa Venice as evidenced by the thirty shares of S. P. Construction, Inc. stock conditioned on that company being able to underwrite its land financing alone, essentially admits the alleged contract to form a joint venture, but sets up new matter that the contract was conditional, seeking to negate its legal effect. Accordingly, we hold that the condition precedent sought to be proved by Papierz at trial is an affirmative defense which Papierz had the burden of proving and the Master erred in placing this burden of proof on Rauth. The condition asserted by Papierz does not constitute merely a denial because it does not negate any essential element of Rauth's prima facie case.

■ ■ Rauth also contends that the Master erred in finding there was no joint venture between him and Papierz.

". . . In a court of equity, the substance of the transaction, and not the form, is to be regarded in the determination of the rights of the parties. A joint adventure may be established without any specific formal agreement to enter into a joint enterprise; it may be implied or proved by facts and circumstances showing such an enterprise was in fact

126

entered into. It is the nature of the enterprise undertaken that controls, not the form of the agreement. If a joint enterprise be proved either by direct evidence of a mutual agreement, or by proof of facts and circumstances from which it is made to appear that such enterprise was entered into, the law fixes the rights of the parties." Ditis v. Ahlvin Const. Corp., 408 Ill 416 at 425, 97 NE2d 244.

It is undisputed that Papierz and Rauth made an agreement concerning the construction of the Villa Venice Apartments and that Rauth was to have a 30% interest in the project. It is undisputed that Rauth paid $10,000 for thirty shares of S. P. Construction, Inc., and that this corporation under their agreement was supposed to take title to the property. It is undisputed that the deal to purchase the Eiserman property was made with S. P. Construction, Inc. as purchaser and Judge Eiserman and his wife as sellers on June 14, 1963, and that Rauth put in many days working on the venture from June until November, 1963. In fact, the Master found that both Papierz and Rauth made a concentrated effort to get land loan commitments for S. P. Construction, Inc. by contacting a large number of financial institutions.

In our opinion, the foregoing undisputed evidence established a joint venture as a matter of law, unless the agreement was conditioned upon S. P. Construction, Inc. being able to obtain the loan commitment from its own resources as claimed by Papierz.

■ ■ Ordinarily, in an action between joint adventurers, the burden of proof as to a certain fact rests on the party who affirmatively alleges or claims that it exists, this being true in respect to such matters as the existence of a joint adventure, the termination of the venture, the realization of profits which should be accounted for and distributed, etc. 48 CJS 853. However, the Master held that Rauth had the burden of proving by

clear and convincing evidence that his interest in the proposed project was not conditioned upon S. P. Construction, Inc. being able to obtain financing for the whole project completely upon its own resources. In doing this, the Master put the burden of proof on this issue on the wrong party. Papierz affirmatively claimed the condition and he has the burden of proving it.

We now consider whether under all the evidence in this case Papierz has sustained his burden of proving that the project was conditioned upon S. P. Construction, Inc. being able to obtain all of the financing for the project with its own resources. This will require a rather detailed analysis of the evidence offered by the principal witnesses who testified on this aspect of the case.

Rauth testified that he had a conversation in early June with Stanley and Theresa Papierz and Theresa suggested that instead of forming a new corporation they would put the project into S. P. Construction, Inc. because this was an existing company and it would save the cost of starting a new corporation. Stanley Papierz agreed with this proposal. Rauth received his certificate for thirty shares of S. P. Construction, Inc. stock on June 10, 1963, when Theresa handed him his stock certificate and told him that he was lucky to be able to get in on a project of this type for only a $10,000 investment.

A few weeks after the trust agreement was signed at the LaGrange State Bank, which was the 12th or 14th of December, 1963, Rauth had a conversation on "the 22nd of December or so" with Papierz. Papierz told Rauth at this time that the project was getting too big, that he had too much money involved out of his pocket and that he no longer wanted Rauth in the project. He told Rauth he was willing to buy back his stock in S. P. Construction, Inc. for $10,000, and he would give him a $6,000 salary or some other type fee for all the work Rauth had done in bringing Villa Venice to a reality.

Rauth refused, and Papierz told him that he would take what he is offered or he would get nothing. He told Papierz that they had an agreement. "I own thirty shares of stock in S. P. Construction Company. A deal is a deal. And Mr. Papierz said, 'I decided there will be no more deal and you get out of the picture.'" Rauth told Papierz, "I have thirty shares of stock," and Papierz told Rauth "that I could take my stock and . . . ." He testified that Papierz further said that "the project will be put in Stanley Papierz Builders and not in S. P. Construction." Rauth told Papierz that the papers were signed, the applications were signed and they had a deal they were going to go through with. Papierz said, "You will take what I give you or you will get nothing," and that was the extent of the conversation. Rauth continued to appear at the offices of Stanley Papierz Builders until the middle of January, and then he stopped coming in.

Maria Grenet testified on behalf of Rauth that she was employed by Stanley Papierz Builders, Inc. in March of 1963 as an accountant and worked there for three years, until May of 1966; that she was also familiar with the corporation known as S. P. Construction, Inc. She received her salary from Stanley Papierz Builders, Inc., and was not an employee of S. P. Construction, Inc. She did all the bookkeeping work, and in the year 1963 she prepared at least four financial statements for Stanley Papierz Builders, Inc. The first of these was around May or June, the second in July or August, and the third around October or November. She prepared one every three months. These were prepared at the request of Theresa Papierz. "They said they wanted to know how their business was going and at other times because they needed a financial statement for financial purposes."

Paul Reynolds, an expert in the field of mortgage financing, testified on behalf of Rauth that it was his opinion that a corporation with the limited resources

of S. P. Construction, Inc. could never have obtained on its own either a mortgage or construction loan in an amount necessary to finance the project.

Stanley Papierz testified that about the time the escrow was opened with Judge Eiserman at the Chicago Title and Trust Company, he and his wife, Theresa, had a conversation with Rauth regarding the project on about the 8th, 10th or 12th of June in the kitchen of his home. He told Rauth what happened with Hurst, that "Ralph" had lied about the land loan, and Rauth told him that he knew that all the time. He knew that Ralph was no good and that he was right to begin with about him. Rauth then asked Papierz what he could do for him and "I told him that I would sell him 30% of S. P. Construction and that he and I would roll up our sleeves and I would go to escrow with Judge Eiserman. I told him that I would make a contract with Judge Eiserman on S. P. Construction and he and I would roll up our sleeves. That is, we would roll up our sleeves and start looking for land loans. I told him that if we could find land on S. P. Construction and if we can swing this deal on S. P. Construction, then Bob will have himself 30% of Villa Venice Apartments. And I also told him, 'Bob, if we cannot swing this deal on S. P. Construction, you understand that not only you might lose money, but that I will, too.'" Rauth said that he was very grateful and he understood that very clearly and Papierz sold him 30% of S. P. Construction, Inc. for $10,000 and Rauth was issued a certificate for thirty shares of S. P. Construction, Inc. stock. That stock was issued on or about June 10, 1963 and represents 30% of the total shares of S. P. Construction, Inc. He and his wife own the remainder of the shares.

He and Rauth then contacted lending institutions together and Rauth went to see other lending institutions on his own during July, August, September, October and

November. Rauth was also coming into the office three or four times a week for about four hours a day.

Papierz was then asked about his answer to Rauth's counterclaim and the following ensued: "The document entitled 'Answer to Counterclaim' filed on December 7, 1964, with the Clerk of the Circuit Court bears my signature. This document was prepared by my attorneys at the time, Castle, Brintlinger, Carey and Filter, and particularly by Mr. Thomas Carey. This document was prepared in accordance with the information I gave my lawyers. This document was under oath and I signed it." The sworn answer to the counterclaim was shown to Mr. Papierz and he was asked to read Paragraph 8 thereof.

MASTER: "If he doesn't understand it all he has to do is say so. That's the reason I asked him to read the question again to him."

ANSWER: "I am sorry, sir, I can't understand this language at all. No, I am not an attorney, I am a builder."

Q. "Isn't it a fact, Mr. Papierz, that what you are saying in Paragraph 8 is that the condition was imposed upon Rauth that he obtain the financing for S P ?"

A. "No, I just don't understand his language here, Judge, in this paper here at all. I probably—if it probably would be put a little bit more clearly to me, maybe I would understand. This is the kind of a pleading that I have no idea what those things say there. See, my attorney wrote this thing, asked me to sign it. I signed it without reading it and that is usually the case."

In August of 1963, Papierz received a commitment from Baird & Warner for a construction loan in the amount of $615,000 for the construction of the middle

131

section of the proposed project, which consisted of five buildings. He did not know where the money came from, but the contractors were getting paid from Baird & Warner. Judge Eiserman was paid for the land in November of 1963. The loans from LaGrange State Bank and Mergreen Company were presently paid in full. Baird & Warner paid off the LaGrange State Bank and Mergreen Company. Mergreen was paid off almost at the end of 1964 and the LaGrange State Bank probably in May or April of 1964.

Papierz submitted to some of the lending institutions his financial statement, those of S. P. Construction, Inc. and of Stanley Papierz, Builders, Inc.

In November, 1963, he learned from Mr. Cummins, a Vice President of the LaGrange State Bank that S. P. Construction, Inc. was not strong enough for that particular project, but they would give him a loan for one section if he would pledge Stanley Papierz Builders' assets and his personal assets. After his conversation with Cummins, he told Rauth he was no longer in the deal. It was the middle or end of November and it was after he had obtained the first commitment from Baird & Warner for a mortgage in the amount of $615,000 and at that time he also had the promise of the LaGrange State Bank and Mergreen that he would have the money if he pledged all of Stanley Papierz's buildings.

He told Rauth that he had been to the LaGrange Bank that afternoon. His wife brought him a piece of paper that showed that they had almost $70,000 invested in the venture in LaGrange and the situation was very hopeless. He told Rauth exactly what Mr. Cummins had told him, "that if I pledge all of my holdings that I will have the loan." He said to Rauth, "Bob, do you recall what we were discussing back in June, that if S P cannot swing it, either we are going to lose money or something will have to happen? Well, this is the case of something is go-

ing to happen, because we will lose. You will lose your $10,000 and I will lose $70,000. Stanley Papierz Builders must step in." He then said, "If I pledge all of my assets, there wouldn't have to be any loss of $70,000." He told Rauth that he was not going to pledge his assets and Stanley Papierz Builders' assets and even his life insurance policies for S. P. Construction, Inc. Rauth said, "I understand it and I understood it in June when you told me that." He told Rauth that if he wanted, he would buy the shares from Rauth and besides that, he would give him $6,000. Rauth said he did not want it, that he wanted 30% of S. P. Construction, Inc. because if another opportunity came up and S. P. Construction, Inc. could swing any future apartments, he wanted to be in on it and that is where they ended and ended as friends. Rauth kept coming around until the end of January when he filed suit. Rauth said to Papierz, "You keep my $10,000.00, Stanley. I don't want the $6,000.00 either." That was after Rauth put in the time from June until November.

Theresa Papierz testified concerning the original agreement between Stanley Papierz and Rauth and also as to what transpired when Papierz dismissed Rauth from the project. Her testimony was substantially the same as her husband's.

Joyce Kobylarz, Stanley Papierz's secretary, testified on behalf of Papierz that about the middle of November, 1963, she had a conversation with Rauth who was talking to a subcontractor and she said, "Mr. Papierz told me that you were not going to be talking to subcontractors any more. That I should handle this." Rauth said, "Well, Joyce, that's all right. I know that I'm out of the deal. S. P. can't swing it, but I want to help Stanley if I can. I would like to see this thing through for him as long as I am here. I would like to talk to him." He then continued during the month of December in her presence

to interview subcontractors. He also came into the office during January and he would interview and talk to subcontractors then.

Walden Cummins, Jr., Senior Vice President of the La Grange State Bank, who in November of 1963 was its Vice President and Trust Officer, testified on behalf of Papierz that he first met Stanley Papierz in the bank about the first day of October, 1963, accompanied by a Mr. Robbins. He next met him about two weeks later when he came into the bank by himself. He first met Robert Rauth about the first week of November, 1963, when Mr. Papierz brought him in and introduced him as his brother-in-law. At that time there was a conversation between himself, Papierz and Rauth. By that time the financing arrangement had been worked out. He further testified, "I gave Mr. Rauth and Mr. Papierz a list of documents needed in order to secure the financing, which they, Mr. Papierz and Mr. Robbins, had requested." There was a general conversation about the location of these documents and a timetable to get them together. The documents that he said he needed were the deeds to fifteen or sixteen residential properties in Arlington Heights, an office building owned by Papierz or his company, and the documentation with reference to the land on which the apartment building project was subsequently built.

The next time he saw Rauth, Rauth came in alone with the documents that he had requested and left them with him. He brought in the deeds to the property, the Chicago Title and Trust Guarantee policies and the contract between the seller of the LaGrange property and the buyer. He continued to see both of them until about December 1, 1963. After Rauth brought in the documents, Rauth, Papierz and Cummins had a conversation in late October of 1963. He testified, "I had been furnished with the documentation previously testified to by the time of this particular conversation. I had an op-

portunity to review it and told them that . . . ." (There was an objection.) He continued after another question, "I remember talking with both Mr. Papierz and Mr. Rauth, in substance stating that I had reviewed this documentation and that it appeared satisfactory to form the basis of collateral for the loan that Mr. Papierz had originally asked for." He then was asked if there was any conversation in relation to S. P. Construction, Inc., and he answered, "The conversation was an observation of myself. I said, 'S. P. Construction Company is not financially strong enough to support this loan request.' "

He testified on cross-examination that S. P. Construction, Inc. and Stanley Papierz Builders, Inc. combined, were not sufficiently strong financially to warrant such a loan, and that he would not have recommended making the loan if the interim loan commitment in the amount of $615,000 had not already been obtained from Baird & Warner, Inc. because, he testified, the bank contemplated being paid off through the funds provided by the construction loan, and not by any funds of Papierz.

The following evidence is inconsistent with Papierz's contention that it was understood at the outset that all financing for the project was to be done solely through the assets of S. P. Construction, Inc.:

(1) The initial down payment of $17,500 was made by Stanley Papierz Builders, Inc. and all of the other expenses for the project were paid by Stanley Papierz Builders, Inc. from the time of the signing of the contract until all of the financing was completed.

(2) The testimony of Paul Reynolds, an expert in mortgage financing, tended to prove that a corporation with the limited resources of S. P. Construction, Inc. could not have obtained on its own the necessary financing for the project. Prior to June 10, 1963, S. P. Construction, Inc. was a dormant corporation wholly owned by Stanley and Theresa Papierz. Its entire assets consisted of equity in three single-family dwellings

135

in Arlington Heights, worth approximately $30,000. It had no office, no employees and maintained an average bank balance of a few hundred dollars.

(3) The undisputed evidence that the personal financial statements of Stanley Papierz and Theresa Papierz and the financial statements of Stanley Papierz Builders, Inc. were submitted to different financial institutions from June, 1963 until November, 1963, for the purpose of obtaining financing.

■ (4) The affirmative defense claimed in Papierz's answer to Rauth's counterclaim was a different defense than he asserted at the trial. This was tantamount to an admission that his trial version was not true. However, it was not conclusive on this issue, but remained with all of the other evidence to be considered on the subject.

(5) On cross-examination Theresa Papierz was confronted with a letter she wrote to Rauth several months after suit was filed in which she said:

> ". . . Let me refresh your memory, we (Stanley and Theresa) were to invest $17,000.00 for the permits, plus our financial statement, plus necessary labor. . . ."

■ In our opinion, Stanley Papierz has failed to sustain his burden of proof that Rauth's interest in the proposed apartment project was conditioned upon all of the financing being done through S. P. Construction, Inc.

Nor do we accept Stanley Papierz's and Theresa Papierz's testimony that Rauth willingly agreed to step out of the project when Papierz informed him that the deal was off.

We do not find clear and convincing Stanley Papierz's testimony that the situation was "hopeless" and that he had to use everything to put the deal through, when at the same time he knew that the loan at the LaGrange State Bank was to be paid from the construction loan

commitment already received from Baird & Warner and when he knew that the LaGrange State Bank was making the loan on the basis of that commitment rather than his pledged assets.

■ Nor do we find clear and convincing the Papierz testimony that Rauth agreeably stepped out of the apartment project, declined the return of his own money in exchange for his stock and turned down a $6,000 profit in the hope that he might finance an apartment project through S. P. Construction, Inc. sometime in the future. This, after he had just been told that he was out of the present project because S. P. Construction, Inc. was not strong enough to finance a loan on its own recources and that Stanley Papierz Builders, Inc. would have to step in.

■ ■ We conclude that Papierz and Rauth were joint adventurers and as such, Papierz occupied a fiduciary relation to Rauth as a matter of law. Consequently, the transaction whereby Papierz acquired Rauth's 30% interest in the apartment project was presumptively fraudulent and void. The burden was then on Papierz to show by clear and convincing evidence that he exercised good faith in appropriating Rauth's interest. In Carroll v. Caldwell, 12 Ill2d 487, 147 NE2d 69, the court said at 498:

> "Defendant concedes, as all authorities hold, that joint adventurers, as a matter of law, stand in a fiduciary relationship to each other and have the duty to act for the benefit of the other as to matters within the scope of the relation. (See: 30 Am Jur, Joint Adventures, Sec 34; 48 CJS Joint Adventures, Sec 5; Restatement of Trusts, Sec 2.) The relationship ordinarily precludes one of them from purchasing or leasing property to the enterprise either for himself or another in the absence of a full disclosure of his associates."

137

In Hagerman v. Schulte, 349 Ill 11, 181 NE 677, the court said at page 30:

> "Since the sharers in the joint adventure sustained a fiduciary relation, each one to all the rest, their dealings with one another were subject to the rule that where one who sustains a fiduciary relationship to another acquires from that other an interest in the property in regard to which the fiduciary relation exists, the burden rests upon the one acquiring the interest to show by clear and convincing evidence that he exercised perfect good faith in the transaction by which his interest was acquired. Transactions between persons in this relation are presumptively fraudulent and void. Courts of equity scrutinize them very closely and before such a contract will be permitted to stand the proof must be clear that good faith has been exercised and confidence has not been betrayed."

In June, Papierz agreed with Rauth to develop the Villa Venice project jointly as coventurers, with Rauth owning a 30% interest. Six months later, Papierz and his wife were the owners of all the property, which was the subject matter of the venture. Gone was Rauth's 30% interest, and lost was the time which he had spent on the project. In our opinion, the burden was on Papierz to show by clear and convincing evidence that he exercised good faith in the transaction. This he failed to do.

Then, too, Stanley Papierz and Theresa Papierz were the directors of and wholly controlled both S. P. Construction, Inc. and Stanley Papierz Builders, Inc. As President of S. P. Construction, Inc., Stanley Papierz directed the LaGrange State Bank to convey title to the Villa Venice Apartment property to Stanley Papierz Builders, Inc., a corporation wholly owned by himself and his wife, although the contract to purchase the property was be-

tween Eiserman and S. P. Construction, Inc. Under these circumstances, the transaction was constructively fraudulent and the burden of showing its fairness and propriety was cast upon Stanley and Theresa Papierz. Winger v. Chicago City Bank & Trust Co., 394 Ill 94, 67 NE2d 265; Shlensky v. South Parkway Bldg. Corp., 19 Ill2d 268, 166 NE2d 793.

For the foregoing reasons, we find that the equities in this case are with the counterclaimant Robert Rauth and against the counterdefendants Stanley Papierz, Theresa Papierz and Stanley Papierz Builders, Inc.

This case is reversed and remanded to the Circuit Court of Cook County, Illinois, with directions to enter a decree (1) directing the conveyance by Stanley Papierz Builders, Inc. to S. P. Construction, Inc., of the property described in paragraph 11 of the Rauth counterclaim; (2) granting Rauth the relief sought in paragraphs (b), (c), (d) and (e) of the prayer for relief sought in his counterclaim; (3) entering such further orders as may be just and equitable; and (4) vacating its order assessing the Master's fees and reassessing them in the light of this opinion.

Judgment reversed and cause remanded with directions.

EBERSPACHER and GOLDENHERSH, JJ., concur.