CHARLES P. BURTELL, Plaintiff-Appellee, *v.* FIRST CHARTER SERVICE CORPORATION *et al.*, Defendants-Appellants.

First District (1st Division)   No. 76-1224

Opinion filed April 21, 1980.

Teitelbaum, Wolfberg, Guild & Toback, and Hinshaw, Culbertson, Moelmann, Hoban & Fuller, both of Chicago (Ronald J. Guild, David A. Weininger, and D. Kendall Griffith, of counsel), for appellants.

Feiwell, Galper & Lasky, Ltd., of Chicago (George S. Feiwell, Michael A. Braun, and Bernard L. Rivkin, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

In a previous appeal herein, this court held we had no jurisdiction to review the issue concerning existence of a joint venture between these litigants. However, we did decide issues raised regarding the accounting between the parties. (*Burtell v. First Charter Service Corp.* (1978), 57 Ill. App. 3d 198, 372 N.E.2d 941.) The Supreme Court of Illinois affirmed the result reached by us concerning details of the accounting (as will later be shown), but held this court had jurisdiction to review the issue regarding existence of the joint venture. The cause was accordingly remanded with direction that we consider that issue. (See 76 Ill. 2d 427, 394 N.E.2d 380.) We have proceeded in accordance with that mandate.

Charles Burtell (plaintiff) is president and owner of Ben Garth Builders and Real Estate Developers. The stock in First Charter Service Corporation (First Charter) is 89 percent owned by Unity Savings of Park Forest, which is in turn a subsidiary of Bass Financial Corporation. Saul

Bass and Howard Bass are directors and officers of First Charter. Ralph Liss is president. Plaintiff had previous dealings with Unity Savings and with Saul Bass.

In May 1972, plaintiff spoke to Saul Bass about acquisition of 22 townhouse buildings in Wheeling, Illinois. Plaintiff suggested a joint venture between himself and First Charter to remodel the property into 88 condominium units. Saul Bass referred plaintiff to his son, Howard Bass. Plaintiff and Howard Bass met and exchanged communications and drafts of agreements with reference to this investment. It is admitted a joint venture was entered into by the parties for this transaction. However, there was no formal written agreement.

The purchase of the Wheeling property was closed in August 1972. The beneficial interest in the trust holding title to the property was assigned to First Charter at the request of Howard Bass. Plaintiff contributed capital of $50,000 and First Charter contributed $212,000. To avoid a requirement of government approval of this investment, the records of First Charter showed no joint venture but only that plaintiff loaned First Charter the $50,000 as evidenced by three promissory notes. It was agreed by the parties that plaintiff would have a 50 percent joint interest in the venture and have a right to 50 percent of the profits.

Plaintiff was to manage the project and handle sales. Each party thereafter contributed additional amounts. Plaintiff contributed $10,000 and First Charter $18,000 to $20,000. Plaintiff's projections indicated all 88 units would be sold in 18 months. Three years later all units had not been sold. This transaction resulted in some tax losses which were used by First Charter.

In the summer of 1973, Harold Goslin, a real estate developer, approached First Charter to discuss possible acquisition of a 12.06-acre parcel of vacant land in Chicago know as the "Foster Dee" property. Goslin met with Ralph Liss to discuss a joint venture between Goslin's company and First Charter for this purpose. Goslin told Liss the lowest price the sellers of Foster Dee would accept was $1,750,000. At a subsequent meeting with Howard Bass and Ralph Liss, Goslin discussed his negotiations with the seller and the possible structure of the joint venture agreement. Goslin's company was to be the builder and developer and First Charter would handle the financing. The formal joint venture agreement was to be executed after the land was acquired.

Plaintiff was also then investigating acquisition of this same property. Plaintiff learned the property could be obtained for $1,500,000. Plaintiff formed a plan for development of the vacant land. He estimated his plan would eventually cost $20 million. Plaintiff testified he wanted "a working relationship with the Basses." He met with Saul Bass in July or August 1973. Plaintiff and Saul Bass discussed the Foster Dee property. Plaintiff

testified Bass told him he was familiar with Foster Dee. Plaintiff asked if Goslin and his partner, Jim McNerney, were talking to Bass about the same property. Bass said McNerney and Goslin "had expressed an interest in it also." Plaintiff testified he "figured that since they [McNerney and Goslin] were there first, I was really dead in acquiring a lender and participator and coventurer, but when I mentioned the price of one million five, his [Saul Bass'] eyes lit up and he mentioned that they were at a much higher figure." Saul Bass told plaintiff to talk to Howard Bass "and start outlining some facts."

Plaintiff stated he met with Howard Bass a day or two later. Plaintiff explained his idea that the property could be obtained for $1,500,000 by way of a three-way trade of property. This method would be advantageous to the seller for tax reasons. Bass advised plaintiff to act quickly on the deal.

Plaintiff testified he then met with the Basses and Ralph Liss. They told him to prepare a contract for $1,500,000. Plaintiff had a contract prepared by his attorney for purchase of Foster Dee naming plaintiff as purchaser. Plaintiff took the contract to Howard Bass for approval. Plaintiff told Howard Bass their relationship "was to be on the same basis that I was a partner in Wheeling." Plaintiff testified Howard Bass "answered in the affirmative, yes." Plaintiff also told Bass that "I was prepared to put in $300,000." When plaintiff said "I", he meant himself and his two partners. Howard Bass agreed to these terms and the contract was submitted through the seller's broker. The broker called back a day or two later. He stated the price was acceptable to the seller but language was necessary in the contract to complete the three-way trade. Subsequently, Ralph Liss telephoned plaintiff to get plaintiff's approval to substitute First Charter as purchaser instead of plaintiff. Plaintiff said that would be acceptable to him.

On October 3, 1973, plaintiff met with Liss, Liss' attorney and the seller's attorney. Plaintiff negotiated a brokerage fee of $10,000 for the seller's broker. For this purpose the purchase price was raised $10,000 with the approval of Liss. The contract was signed by the parties with a purchase price of $1,510,000 and First Charter as the purchaser. Plaintiff, with the acquiescence of Liss, then ordered a soil test for the property. Plaintiff paid $2509 for the test. Plaintiff testified a broker would not normally pay for a soil test. Plaintiff never billed First Charter for this test. He did not attend the closing of the sale on October 22, 1973, and did not contribute any capital towards the purchase of Foster Dee.

Plaintiff's version of the events prior to the closing was contradicted in part by the testimony of Saul Bass, Howard Bass and Ralph Liss. Saul Bass admitted meeting with plaintiff and telling plaintiff, as he tells all speculators, to "tie it [Foster Dee] up and we will take a look at it and let

you know if we are interested or not." However, Saul Bass stated he and plaintiff never discussed a joint venture regarding the Foster Dee transaction. Saul Bass dealt with plaintiff even though he had an agreement with McNerney and Goslin that "if they bought the property, they would enter into some kind of agreement with us." Saul Bass called either McNerney or Goslin and told them plaintiff could buy the property for less money than what McNerney and Goslin were planning to pay. Saul Bass stated McNerney and Goslin subsequently abandoned the Foster Dee transaction.

Howard Bass testified he discussed a possible joint venture with McNerney and Goslin in the summer of 1973. Howard Bass stated plaintiff first approached Liss and himself in September 1973. Plaintiff told them the Foster Dee property was available for $1,500,000. Howard Bass and Liss told plaintiff that "if he could obtain a contract for us to purchase the property for a million and a half dollars, he could earn himself a commission or some sort of fee arrangement." They had paid plaintiff finder's fees in previous transactions. Howard Bass testified the amount of such a fee was never discussed. Howard Bass and Liss did not discuss a joint venture with plaintiff at that meeting or at any time prior to the execution of the contract. When the Bass group called McNerney and Goslin to tell them about plaintiff's proposals, all parties agreed to give plaintiff a "chance to get a contract executed for the First Charter divider property [Foster Dee] at a million five."

Howard Bass specifically denied having a conversation with plaintiff in September 1973 in which he agreed their relationship was to be on the same basis as the Wheeling venture and in which plaintiff told him he was willing to invest $300,000. Howard Bass stated plaintiff volunteered to get the soil tests done and the Bass group agreed but plaintiff never submitted a bill for the tests.

Ralph Liss testified plaintiff never asked for a fee or a commission. Liss acknowledged plaintiff did negotiate the broker's fee at the contract signing on October 3, 1973, and plaintiff did pay for the soil tests. However, Liss stated he never discussed any development plans for Foster Dee with plaintiff but only discussed such plans with McNerney and Goslin.

John B. Murnighan, the attorney for the sellers of the Foster Dee property, testified the sellers rejected plaintiff's offer to purchase Foster Dee for $1,500,00 in cash. The sellers did not want to sell the property for that price unless it was a three-way trade as previously discussed. Subsequently, after discussions with Liss and Liss' attorney, a contract was entered into with First Charter for sale of Foster Dee for $1,510,000 in a three-way trade transaction. Plaintiff was at the contract signing.

Plaintiff never represented himself as an agent acting on behalf of First Charter nor did any representatives of First Charter say plaintiff was their agent.

Harold Goslin testified that after his discussions with the Bass group concerning Foster Dee, he received a telephone call from Howard Bass or Ralph Liss informing him Foster Dee was available for less than $1,750,000. Goslin and McNerney went to a meeting with the Basses and Liss. They were told by Liss the property was available for $1,500,000. Liss said plaintiff came in with the deal at that price and asked if they wanted to participate.

Goslin further testified Liss told him that perhaps "the three of us could get together." Liss also asked Goslin to stay out of the transaction "and let him handle the negotiations." Goslin had no further communication with the Bass group until after the closing of the Foster Dee transaction. Goslin did not receive any remuneration from First Charter.

Following the closing, the events that transpired are basically undisputed. Plaintiff testified that shortly after the closing, he had a conversation with Ralph Liss. Plaintiff told Liss he was a 50 percent partner. Liss replied plaintiff was not a partner and was only entitled to "a portion of the savings" on the Foster Dee transaction. Liss told plaintiff this portion of the savings was $60,000, using a tax formula as a basis of computation.

Some time later, plaintiff attended a lunch meeting with Liss, the Basses, McNerney and Goslin. Liss proposed a joint venture among all the parties but plaintiff refused stating he "didn't need McNerney and Goslin, and they said the same thing." Goslin and Liss both corroborated plaintiff's testimony about this meeting.

Plaintiff met on several other occasions with Liss and the Basses to ascertain plaintiff's role in the Foster Dee transaction. The Bass group always asserted plaintiff was entitled to a "portion of the savings." Plaintiff told Liss he was willing to come up with the money for his half. Liss told plaintiff it would cost him $755,000 in cash to participate. Liss sent plaintiff a proposed joint venture agreement in February 1974. This document provided for sale to plaintiff of a one-half interest in Foster Dee for a price of one-half of First Charter's acquisition costs. Plaintiff refused to accept this agreement.

In a letter sent from Liss to plaintiff concerning this proposed agreement, Liss stated plaintiff "has definite skills and capabilities which would make this joint venture beneficial to both parties." Yet Liss testified that during the same time period, he told plaintiff he was dissatisfied with plaintiff's efforts in selling the housing units in the Wheeling project.

Plaintiff also made a proposal to buy First Charter's interest in the

Foster Dee deal. Plaintiff enclosed a check for $10,000 as earnest money with his proposal. However, the Bass group would not even consider selling plaintiff a one-half interest in Foster Dee unless plaintiff bought their interest in Wheeling. Plaintiff refused this offer. No deal was consummated, and the $10,000 was subsequently returned to plaintiff.

Ralph Liss and Howard Bass also testified as to the negotiations between First Charter and plaintiff after the closing of the Foster Dee transaction. Liss stated he communicated his dissatisfaction to plaintiff about the way plaintiff was managing the Wheeling venture.

Liss stated First Charter would not enter into a joint venture with plaintiff for Foster Dee unless plaintiff divested himself of his interest in Wheeling. Howard Bass testified that in April 1974, the parties were still discussing "who was going to wind up with which property." However, Liss and Howard Bass ultimately felt they could not settle the matter short of litigation. They sold the Foster Dee property on May 3, 1974, to another group for $1,750,000. No one from First Charter informed plaintiff Foster Dee was going to be sold.

On the basis of the evidence, the trial court found that a joint venture existed between plaintiff and First Charter with respect to the Foster Dee property "from the latter part of September, 1973, until the date the property was sold, May 3, 1974." In so holding, the trial court stated:

> "I never attempted to find that there had been conversations which specifically gave rise to a completely well-defined oral partnership undertaking. That is not in fact what occurred here.
>
> It was the conduct of the parties as well as their various conversations and activities which created the legal relationship in my judgment of joint venturers, and I am not able to define, on the basis of this record, specific terms because the joint venture did not arise in that [fashion]."

■ A joint venture has been defined as "an association of two or more persons to carry out a single enterprise for profit." (*Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, 317, 396 N.E.2d 524.) Generally a joint venture "relates to a single specific enterprise or transaction * * *" while a partnership "relates to a general business of a particular kind." *Smith*, 77 Ill. 2d 313, 317-18, quoting *Harmon v. Martin* (1947), 395 Ill. 595, 612, 71 N.E.2d 74.

A joint venture may be organized by a specific contract between the parties. However, like other contractual relationships, a formal agreement is not an indispensable necessity. On the contrary, a joint venture may be established by facts and circumstances giving rise to the necessary implication.

In *Ditis v. Ahlvin Construction Co.* (1951), 408 Ill. 416, 425, 97 N.E.2d 244, our supreme court stated:

"In a court of equity, the substance of the transaction, and not the form, is to be regarded in the determination of the rights of the parties. [Citation.] A joint adventure may be established without any specific formal agreement to enter into a joint enterprise; it may be implied or proved by facts and circumstances showing such an enterprise was in fact entered into. [Citation.] It is the nature of the enterprise undertaken that controls, not the form of the agreement. [Citation.]"

While surrounding circumstances can prove the existence of a joint venture, "there must be a meeting of the minds; there must be an agreement, express or implied, one which shows the parties intended to embark on a joint venture." (*Electrical Contractors, Inc. v. Goldberg & O'Brien Electric Co.* (1975), 29 Ill. App. 3d 819, 822-23, 331 N.E.2d 238, *appeal denied* (1975), 60 Ill. 2d 596.) In this regard, First Charter contends plaintiff's testimony concerning his conversation with Howard Bass, in which the parties agreed upon a joint venture on the same basis as their Wheeling joint venture, was not credible and was negated by plaintiff's previous statements in depositions and by other testimony.

In the instant case the testimony of all parties was susceptible to a challenge of credibility. In such a situation, "especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." (*Reese v. Melahn* (1973), 53 Ill. 2d 508, 513, 292 N.E.2d 375, quoting *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 226 N.E.2d 624.) Moreover, despite the contention of First Charter, this testimony by plaintiff is not the only evidence of an agreement to form a joint venture as to the Foster Dee property. As the trial judge carefully pointed out in his remarks above quoted, it was the surrounding facts and circumstances of the dealings between the parties that implied the existence of a joint venture.

Plaintiff and First Charter had previous dealings with the Wheeling joint venture in which plaintiff was entitled to 50 percent of the profits even though he contributed significantly less capital than First Charter. When plaintiff approached the Basses and Liss about the possibility of obtaining the Foster Dee property at a lesser price than that mentioned by McNerney and Goslin, they encouraged plaintiff to try to obtain the property. Goslin, a totally disinterested witness in this case, testified Liss told McNerney and himself plaintiff had come in with the Foster Dee deal and asked if First Charter wanted to participate. This contradicts the testimony of the Basses and Liss that a joint venture was never discussed with plaintiff prior to the execution of the contract. Howard Bass testified he told McNerney and Goslin to "give Burtell a chance to get a contract

executed * * *." At this time, Howard Bass had already discussed a possible joint venture with McNerney and Goslin.

Furthermore, plaintiff kept himself totally involved in the negotiations concerning the acquisition of Foster Dee. At the meeting in which the contract was executed with First Charter for purchase of Foster Dee, plaintiff negotiated the brokerage fee of $10,000 for seller's broker with Liss' approval. Plaintiff ordered and paid for soil tests, actions not normally taken by a broker. Murnighan testified plaintiff never represented himself as an agent acting on behalf of First Charter, and no representative of First Charter told him plaintiff was their agent. Thus, quite aside from plaintiff's testimony, these facts and circumstances lead to the conclusion that plaintiff and First Charter had formed a joint venture for the acquisition and development of Foster Dee prior to the execution of the purchase contract on October 3, 1973.

The actions of the parties after the contract date further corroborate this conclusion. Despite dissatisfaction with plaintiff's handling of the sales regarding the Wheeling venture, First Charter actually submitted a formal joint venture agreement to plaintiff with respect to Foster Dee.

■■ The conclusion of the able trial judge that a joint venture existed between plaintiff and First Charter with respect to the Foster Dee property was a finding of fact. We cannot say this finding is manifestly against the weight of the evidence. "[T]his court will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence." (*Reese*, 53 Ill. 2d 508, 513.) We have carefully considered the instant case with this scope of review in mind. We conclude there is no reason for us to disturb the trial court's findings with respect to existence of the joint venture. Accordingly, that portion of the judgment of the circuit court is affirmed.

The remaining issues pertain to the accounting. First Charter objected to allowance to it by the trial court of interest on moneys advanced at the rate of 5 percent per annum. This court and the supreme court affirmed that result. (*Burtell*, 76 Ill. 2d 427, 438-39.) On this basis the amount due plaintiff was fixed in the final judgment of the trial court entered June 1, 1976, at $89,998.22.

Plaintiff objected to the accounting on the theory that it should have included a credit to plaintiff for principal and interest profit on a purchase money mortgage received by First Charter when the joint venture property was liquidated. The trial court denied this request. This court reversed that ruling. The supreme court held that plaintiff is "entitled to an accounting for the payments of principal and interest on the purchase-money mortgage * * *." *Burtell*, 76 Ill. 2d 427, 439.

Consequently, the judgment appealed from entered June 1, 1976, is affirmed as regards the judgment in favor of plaintiff in the amount of

$89,998.22. The judgment is reversed with reference to refusal to grant plaintiff an accounting by First Charter of principal and interest profit, if any, received by First Charter on the purchase money mortgage in question. The cause is remanded with directions that an accounting be taken between the parties concerning such profit, if any.

Affirmed in part, reversed in part and cause remanded with directions.

McGLOON and O'CONNOR, JJ., concur.