PALIN MANUFACTURING COMPANY, INC., Plaintiff-Appellee, *v.* WATER TECHNOLOGY, INC., *et al.*, Defendants-Appellants.

First District (5th Division) No. 80-3197

Opinion filed January 14, 1982.—Rehearing denied March 4, 1982.

---

Eugene F. Friedman, of Chicago, for appellants.

Robert M. Ward, of Cook, Wetzel & Egan, Ltd., of Chicago, for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Defendants Water Technology (Water Tech) and A. Allen Morr (Morr) appeal from that portion of a trial court's order which permanently enjoins them from manufacturing, marketing or selling the "sludge separator device" of plaintiff, Palin Manufacturing Company, Inc. (Palin), or any device utilizing Palin's design features and engineering characteristics. This order followed a hearing on Palin's verified complaint for injunctive and other relief which alleges that defendants have misappropriated Palin's trade secrets. In addition to the granting of injunctive relief, the trial court imposed a constructive trust upon the gross profits received by defendants resulting from the sale of Palin's device. Further proof was ordered by the court with regard to damages sustained by Palin, along with attorney fees.

Defendants raise the following issues on appeal: (1) the injunction violates section 3—1 of the Injunction Act (Ill. Rev. Stat. 1979, ch. 69, par. 3—1 et seq.) because it (a) contains no reasons for its issuance, (b) fails to describe the enjoined acts in specific detail, and (c) refers to another document when describing the prohibited acts; (2) the injunction is invalid since it is not limited to the time required to "reverse engineer" Palin's product; (3) the trial court erred in failing to consider the relative hardships upon the parties when it issued the injunction; (4) the injunction contains no finding, and the hearing produced no evidence, of irreparable

harm to Palin justifying the restrictions against defendants; (5) the trial court's failure to join Pangburn, an indispensable party, renders the injunction void; (6) the trial court's refusal to rule on Pangburn's motion for a change of venue renders the injunction void (Pangburn was joined as a party defendant during the hearing and subsequently dismissed from the case); (7) Palin failed to prove that its drawings or sludge separator device were trade secrets; and (8) the trial court erred in finding a fiduciary duty owed by Morr to Turnquist.

The following testimony was adduced at the hearing and is pertinent to our decision.

Sanfred Turnquist, the president of Palin, testified that his company developed and marketed paint sludge removal equipment. In 1976, Palin installed a prototype paint sludge separator, which was designed to remove paint sludge from water, in the General Motors (GM) plant in Janesville, Wisconsin. GM had a problem at the Janesville plant with the removal of paint overspray accumulated during the process of painting vehicles. This overspray was collected in water wash booths by a ventilation system. GM needed a device that would separate the live paint from the water in the wash booths, in order to facilitate the paint's efficient disposal. Palin's device, which attempted to achieve this purpose, was developed by Turnquist over a period of three years at a cost of about $100,000. However, initial testing of Palin's prototype unit proved unsuccessful in solving GM's problem. The chemicals employed in Palin's prototype unit to "detactify" or kill the paint were ineffective, and live paint clogged GM's sewer system.

In April of 1977, Turnquist met Warren Pangburn, a sales representative from Detrex Chemical Company. Pangburn had been attempting to sell GM his company's chemicals for use in detactifying the live paint accumulated in the spray booths. Robert Radtke, GM's superintendent of maintenance encouraged Pangburn to work with Turnquist to try to eliminate this problem. Although Pangburn's chemicals were more successful than those previously used with Palin's device, they, too, did not kill all the paint.

Subsequently, Turnquist decided to hire Pangburn as a technical sales representative to market Palin's device for a 10% commission. Pangburn left Palin's employ in November of 1977 after Turnquist rejected his request to be paid a straight salary. According to Turnquist, Pangburn was helpful to him during their relationship because he "had a rapport with many employees at General Motors." But Turnquist stated that Pangburn had no part in designing Palin's sludge separator device.

Radtke introduced Morr, the president of Water Tech, to Turnquist in the fall of 1977. Water Tech marketed an electrostatic treater unit that detactified paint. Morr and Turnquist agreed to install one of these units

on the same booth at GM where Palin's prototype was being tested. The electrostatic unit proved to be highly successful, so the two decided to submit a "joint marketing quotation" to GM for the products. The quote, submitted on November 4, 1977, listed Palin's device along with Water Tech's electrostatic treater. Pangburn delivered the quote, along with two or three drawings of Palin's device, to GM.

In December of 1979, Turnquist learned that Water Tech was advertising for the sale of a sludge separator device in a trade magazine. This device had many of the same characteristics as Palin's equipment. Subsequently, GM purchased one of Water Tech's sludge separator devices. Although Palin had not been actively marketing its device elsewhere, GM bought its prototype unit. However, Palin did not sell GM any other device.

According to Turnquist, defendants misappropriated two drawings of Palin's sludge separator device and utilized them in producing their own sludge separator. These drawings, Turnquist claims, constitute trade secrets.

On cross-examination, Turnquist admitted that the drawings in question were not marked confidential, and that he never told Radke or GM that the information on the drawings was confidential. In fact, he failed to mark any written materials or advise anyone that his developments constituted trade secrets or were to be considered confidential information. Turnquist admittedly tested the sludge separator device at GM in an effort to later sell it the equipment. He and the GM employees had a "free run" of the plant during the testing period. Turnquist never challenged the security employed at the GM plant, but had no reason to doubt its adequacy.

Allen Morr testified as an adverse witness. The testing of his company's equipment in conjunction with Palin's device at GM ran for 90 days—from October 10, 1977, to January 10, 1978. On various occasions during this 90-day period, Morr met with both Pangburn and a patent attorney to discuss the patenting and marketing of a sludge separator device. On January 11, 1978, one day after the testing period expired, Morr wrote GM a letter quoting for purchase Water Tech's electrostatic water treaters. The letter stated that the purchase was "not contingent upon the use of automatic filtering equipment, such as that manufactured by Palin Manufacturing Company."

Morr further stated that one had to fill out a temporary visitor's pass, sign a registration form and state one's business before entering the GM plant. In order to view the inside of Palin's sludge separator, it was necessary to climb a ladder. The functional parts of the device were not visible from this vantage point since the water in the tank was murky.

Defendants offered testimony at trial from an evidence deposition of

Maurice Frey, a plant engineer for GM. Frey stated that he was unaware of any promise on behalf of GM to maintain secrecy with regard to Palin's product or the drawing of it. He knew of no instances where GM promised an outside supplier to keep such a product secret.

The evidence deposition testimony of Robert Radtke also established that Turnquist never requested that information concerning his device be kept a secret or that access to it be restricted. According to Radtke, contractors, retirees, and current and former GM employees are allowed entry into the plant. The general public can also be escorted through it on a guided tour.

Robert Ellis, a retiree from GM, testified that his job was to maintain the spray booths at the plant. In Ellis' opinion, the Palin sludge separator never worked properly due to its faulty design. He was never admonished as to the equipment's secrecy.

Allen Morr, resuming the witness stand, testified that he did not use any of Palin's blueprints in producing Water Tech's sludge separator. He made no measurements of the Palin unit installed at the plant. Morr stated that Water Tech's device was made from drawings that it generated. No mention of confidentiality concerning Palin's blueprints was made to him by Turnquist.

Warren Pangburn testified that he made several suggestions to Turnquist concerning the improvement of Palin's device, but they were rejected. Pangburn was never told that the drawings of the device were confidential or that they constituted trade secrets. Nor did he use the drawings to develop a unit. However, based upon his experience with other sludge removal equipment as well as with Palin's, he was able to design a sludge separator of his own.

Shortly after leaving Palin's employ, Pangburn began to work for Morr. He made a series of drawings of sludge devices about three weeks after changing jobs and showed them to Morr. Finally, Pangburn stated that Turnquist never asked him to return his copies of the drawings of Palin's device.

OPINION

In order to assess the validity of the permanent injunction, it is essential to examine the question of whether Palin proved that it possessed a trade secret that was subject to misappropriation by defendants. ■■ A trade secret is a plan, process, tool, mechanism or compound known only to its owners and those employees to whom of necessity the secret is confided. (*Schulenburg v. Signatrol, Inc.* (1966), 33 Ill. 2d 379, 212 N.E.2d 865, *cert. denied* (1966), 383 U.S. 959, 16 L. Ed. 2d 302, 86 S. Ct. 1225.) A trade secret must be a secret in fact. (*Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 256 N.E.2d 357.)

The extent of measures taken by the owner to guard the secrecy of the information is determinative of whether it is a trade secret. (*Affiliated Hospital Products, Inc. v. Baldwin* (1978), 57 Ill. App. 3d 800, 373 N.E.2d 1000; Restatement of Torts §757, Comment b (1939).) A trade secret implies novelty, and where the process or method is disclosed to other persons it cannot be claimed to remain a trade secret by the alleged owner. *Schumann v. Ipco Hospital Supply Co.* (1981), 93 Ill. App. 3d 1053, 418 N.E.2d 161; *Wesley-Jessen, Inc. v. Reynolds* (N.D. Ill. 1974), 182 U.S.P.Q. 135.

■■ Applying the foregoing principles to the instant case, it is evident that neither Palin's drawings nor its sludge separator device were trade secrets. The inventor of the apparatus, Turnquist, never treated it or its drawings as secrets, and took no steps to guard their confidentiality. Turnquist not only installed the actual prototype unit at the Janesville plant in an effort to sell it to GM, but provided the company with the very drawings claimed to be protected. The testimony of Turnquist as well as all the GM employees is uncontroverted that no admonishments were given to GM that the device was considered by Palin to be confidential, and, accordingly, none of the drawings was marked as such. In addition, no steps were taken to restrict access to the area of the plant where Palin's device was installed. For instance, contractors, retirees, employees and others were allowed to enter the GM plant with relative ease. It was not the policy of GM to guard the secrecy of an outside supplier's device, and GM specifically disavowed any obligation of confidentiality to Palin in the purchase order when it acquired Palin's prototype unit. Furthermore, the drawings and the devices were shown to both Pangburn and Morr without any admonishments as to their confidentiality. In sum, this information was freely disseminated by Turnquist to several people in an effort to both improve the device and to eventually sell it. Since no steps were taken by the owner to protect the confidentiality of the information, it cannot be deemed a trade secret. Therefore, in the absence of trade secret status, injunctive relief was inappropriately given to Palin. See *Leavitt Co. v. Plattos* (1975), 27 Ill. App. 3d 598, 327 N.E.2d 356.

The trial court apparently recognized that no trade secret existed. At the conclusion of the hearing, the court stated: "As I say, it may be there is nothing unique in this product, and it may be very well that the world is free to produce it." However, the court further found that Morr and Water Tech shared a fiduciary relationship with Turnquist and Palin, and that defendants violated an implied agreement not to disclose the confidential information to which they were privy. This finding leads us to the second issue: Was there a fiduciary relationship between Turnquist and Morr when the information was disclosed which prevented defendants from employing it in making a similar device?

Palin argues that a fiduciary relationship was created between Turnquist and Morr because they engaged in a joint venture to market their respective devices.

■■ However, we hold that the evidence does not establish that a joint venture existed. The burden of proving a joint venture is upon the party asserting its existence. (*Hurst v. Papierz* (1970), 129 Ill. App. 2d 117, 262 N.E.2d 773.) In order to establish a joint venture, the following factors must be present: (a) a proprietary interest in the subject matter, (b) a community of interest, (c) a right to govern the policy in connection therewith, and (d) a sharing in both profits and losses. (*Richton v. Farina* (1973), 14 Ill. App. 3d 697, 303 N.E.2d 218.) While surrounding circumstances can prove the existence of a joint venture, " 'there must be a meeting of the minds; there must be an agreement, express or implied, one which shows the parties intended to embark on a joint venture.' " (*Burtell v. First Charter Service Corp.* (1980), 83 Ill. App. 3d 525, 531, 404 N.E.2d 455, 459.) Undisputedly, there was no written agreement between the parties to enter a joint venture. But according to Turnquist, the parties orally agreed to "jointly quote" the sludge separator device and the electrostatic unit to GM since the products were "mutually beneficial." On November 4, 1977, Water Tech, through Morr, wrote a letter to GM on Water Tech's stationery listing the prices of the two devices made by Palin and Water Tech.

■■ We believe that even though it may have been "mutually beneficial" to quote prices on the devices simultaneously, this does not establish a joint venture between the parties. The testimony concerning this joint marketing effort does not disclose whether there was to be a sharing of profits and losses between the parties. Nor is there any evidence concerning the rights of the parties to govern the project, or the degree of communal or proprietary interest possessed by each. In our view, Turnquist and Morr simply quoted the devices together for the sake of convenience, without any exchange of obligations or duties. Therefore, we hold as a matter of law that Palin did not establish the existence of a joint venture.

■■ We also note that the trial court's reliance on *Affiliated Hospital Products, Inc. v. Baldwin* (1978), 57 Ill. App. 3d 800, 373 N.E.2d 1000, in finding an implied agreement between Turnquist and Morr to hold the disclosed information as confidential, is misplaced. There, the court ruled that Baldwin, the misappropriator of MPL's trade secrets (drawings of machinery to process hypodermic needles) acquired the confidential information while he stood in a fiduciary relationship with MPL. Therefore, he could not disclose or use it, even though his employment contract with MPL containing a prohibition against such disclosure had expired. The court also rejected the argument of Mittermeier, who utilized the

drawings, that he was unaware that the unmarked drawings were considered confidential. However, we note that Baldwin, who was previously employed as the president of MPL, personally attempted to maintain the confidentiality of MPL's proprietary data through various means. Likewise, Mittermeier had signed an agreement when he visited the MPL plant which prohibited disclosure or use of any information gleaned therein. He was also aware of a proposed licensing agreement between Baldwin (after he left MPL) and another company prohibiting disclosure of the drawings. In short, both defendants in *Affiliated Hospital Products* had ample notice that the drawings were held as confidential information. The situation is different here. Morr, unlike Baldwin, never held a fiduciary relationship with Turnquist and never had reason to believe that the drawings or the sludge separator device were trade secrets. Thus, we can see no reason to find that there was an implied agreement between the parties to hold the disclosed information as confidential matter.

Because we believe that Palin has not shown that it possessed a trade secret subject to misappropriation by defendants, the trial court erred in enjoining them from producing similar devices. Our resolution of the controversy on this basis renders it unnecessary to address the other issues defendants have raised.

For the reasons stated, the judgment of the circuit court is hereby reversed.

Reversed.

SULLIVAN, P. J., and MEJDA, J., concur.