ANDREA DUMON, INC., Plaintiff-Appellant, *v.* PITTWAY CORPORATION *et al.*, Defendants-Appellees.

First District (2nd Division) No. 81—1351

Opinion filed November 9, 1982.

Leonard M. Ring and Judith E. Fors, both of Leonard M. Ring & Associates, of Chicago, for appellant.

William R. Carney and John W. Rotunno, both of Bell, Boyd & Lloyd, of Chicago, for appellees.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff Andrea Dumon, Inc., brought this action in the circuit court for an injunction and for damages, alleging that defendant Pittway Corporation, through its division known as the Barr-Stalfort Company (Barr), misappropriated Dumon's secret processes and methods for the manufacture of an aerosol foam depilatory. The trial court held that the methods and processes were not protectable because they were not of such a special nature as to be trade secrets, and that Barr had been expressly released from the secrecy agreement between the parties because Dumon's manufacturing methods were commonly known in the industry at the time that Barr began to use them and to divulge them to others. Plaintiff appeals, contending that: (1) the trial court's finding that the manufacturing process was not a trade secret was against the manifest weight of the evidence; (2) the trial court erred in finding that Barr had not breached a fiduciary duty which existed apart from the secrecy agreement between the parties; (3) the trial court should have stringently tested the authenticity of two of defendant's exhibits before receiving them into evidence; (4) the trial court abused its discretion in allowing two of defendant's witnesses to testify as experts; (5) the trial court abused its discretion in allowing defendant's trial counsel to testify as a witness in the case without requiring him to withdraw; and (6) plaintiff was denied a fair trial due to the physical and mental infirmity of its trial counsel, who was terminally ill during the pendency and trial of this case.

Plaintiff is an Illinois corporation which was engaged in the sale of various cosmetic products. Defendant Barr manufactures and packages various aerosol products for others according to formulas and manufacturing procedures developed by Barr, its customers, or both. The events which culminated in this litigation began in March 1969, when Bernard Malits, plaintiff's president, entered into an agreement with Sam Rogers under which plaintiff purchased the rights to a for-

mula and manufacturing process for an aerosol foam depilatory that Rogers had developed. In June of 1969, plaintiff and Barr entered into an agreement by which Barr would prepare and package a foam depilatory for plaintiff to be marketed under the trade name "Gone." The ingredients of the product were to be provided by plaintiff in coded containers and the exhibit to the manufacturing contract which set out the compounding instructions did not identify the ingredients other than by code name. The agreement provided that Barr would keep the "processes and methods set forth in said attached Exhibit A secret and in and of the strictest confidence." The agreement also provided that if those processes or methods "are or should become a matter of general knowledge within the industry, Barr's duty of non-disclosure hereunder shall then terminate." Although the agreement states that the pertinent exhibit was attached, the exhibit was not shown to Barr's officers until after the contract was signed. The exhibit reads as follows:

"Heat 2000cc distilled water or deionized water to 85C, then add solid Chemical X and stir until dissolved. Then add 1460cc cold water and stir a little. Then cool this mixture to 31 or 30°C. Then slowly add the calcium thioglycollate (240 grams) and stir mechanically for 10 minutes. The rpm rate of stirring should be between 1000 to 4000 rpm and less rpm if the blade is larger. After 10 minutes of stirring the above mixture, slowly add liquid chemical No. 3 and again stir for 10 minutes. After 10 minutes, add the perfume slowly and again stir for 10 minutes. The whole process should take 40 minutes after adding the calcium thioglycollate. Propellants 8% of 114-40% 12-60%."

Barr commenced production of "Gone" for plaintiff. Plaintiff had some difficulty in marketing the product as it was first compounded, because the original mixture removed hair slowly, had an unpleasant odor, and was irritating to the skin of users. Barr stopped producing "Gone" for plaintiff in 1970.

In 1971, Barr began packaging an aerosol foam depilatory known as "Take 3" for Depilan, Ltd. Three hundred thousand cans of this depilatory were eventually produced. The manufacturing procedure used for "Take 3" was similar to that used for "Gone," although the parties dispute whether the procedures were identical. In that same year, Barr furnished 5,000 cans of depilatory to Scholl, Inc., for test marketing in Europe. An agreement was contemplated by which Barr would supply Scholl with depilatory for sale in the United States and would provide Scholl with a formula and production method for Scholl's use in manufacturing a depilatory for the European market.

Barr, in correspondence with Scholl, stated that it was providing the formula and production method "in confidence." No final contract was ever made between the companies and no secrecy agreement was entered into.

The names of the coded ingredients in plaintiff's formula were never revealed to Barr. It is undisputed that those ingredients were well known and commonly used in the manufacture of aerosol foam depilatories. Plaintiff's contention at trial and on appeal is that the method of manufacture, particularly the heating and cooling of the formula to the specific temperatures set forth in the exhibit to the agreement, prevents a valve clogging problem common to this type of product and that therefore this "process and method" of manufacture is a legitimate trade secret which Barr appropriated by using the process in the manufacture of subsequent products.

Defendant Morris Root, a chemist and the Barr vice-president who executed the contract with plaintiff, testified that he did not know what "processes and methods" meant in the context of the contract, but that he felt certain when the contract was entered into that the formula must have contained "secret ingredients," because he had been making depilatories using the same manufacturing procedure that was used for plaintiff for many years.

Sam Rogers testified for plaintiff that he had conducted many experiments while seeking to eliminate the valve clogging problem that had once been common to aerosol foam depilatories. He stated that 85°C was the optimum temperature for melting the first ingredient in the formula, because that ingredient, an emulsifier, will develop "bubbles" or "globules" if it is heated at temperatures a few degrees higher or lower. On cross-examination, Rogers stated that no bubbles appear at 75°C, but later stated that some bubbles are present if the emulsifier is heated to that temperature. He also stated that although 85°C was the best temperature, giving a specific temperature to the manufacturing workers was a matter of "picking one number" to put into the instructions.

Defendant's expert witnesses included Dr. Robert Sliwinski. Dr. Sliwinski testified that he had been working with aerosol products since 1959 and that he obtained a patent on a formula for an aerosol foam depilatory in 1967. In his patent he set forth instructions for manufacturing the product which were similar to the process at issue in this case. He did not attempt to patent the production method provided with his formula. Dr. Sliwinski's production method calls for heating the emulsifier to a range of 75°C or 80°C rather than to a specific temperature. He testified that the procedures set out in his

patent were common practices among emulsion chemists, and that a range of heating temperatures between 65°C and 90°C would create no difference in the emulsion, although if a higher temperature was used a simple adjustment would have to be made to compensate for the evaporation of water in the mixture.

Dr. Paul Sanders, an organic chemist with experience in foam depilatories and the author of two books on aerosol technology, testified that a formula for an aerosol foam depilatory could be heated to within a range of temperatures with no difference in the product and that the temperature to which the mixture is cooled is not important. Dr. Sanders stated that his answer to a contention that a functional depilatory could only be made by cooling and heating the formula to specific temperatures would be that such a statement was "nonsense."

Peter Cade testified that he was the Director of Research for Croda, Inc., which manufactures the emulsifier which is called "chemical X" in the plaintiff's formula. He stated that in order to make an emulsion from that product it was only necessary to heat the water to a fairly high temperature, melt the emulsifier, and add the emulsifier to the water with good agitation. He also stated that as long as the heating temperature is above the melting point of the emulsifier, it does not matter how high the temperature gets, so long as the water in the mixture does not boil.

Plaintiff's first contention on appeal is that the trial court's finding that plaintiff's methods and processes are not a protectable trade secret is against the manifest weight of the evidence. The judgment of a trial court sitting in a bench trial will not be reversed as being against the manifest weight of the evidence unless the appellant presents evidence so strong and convincing as to overcome the evidence existing in the appellee's favor. (*Schoenberger v. Chicago Transit Authority* (1980), 84 Ill. App. 3d 1132, 1136, 405 N.E.2d 1076.) The trial judge sitting without a jury evaluates the credibility of the witnesses, and determines the weight to be accorded to contradictory testimony, and his findings are presumed to be correct. See *Hill v. Hill* (1979), 79 Ill. App. 3d 809, 814, 398 N.E.2d 1048.

In the instant case, the trial court's findings of fact stated that "[p]laintiff's procedures, methods and processes employing particular temperatures were not of such a special nature so as to possess a protectable value." A manufacturing process is regarded as a protectable "trade secret" if it is

" 'known only to its owner and those of his employees to whom it is necessary to confide it. *** ' [A] mere mechanical advance

in the use of a process is not a new process or discovery. To be a new process there must be employed creative faculties in originating it amounting to a meritorious discovery or invention." *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 546-47, 132 N.E. 806.

Plaintiff contends that its method of heating the water to 85°C to dissolve the emulsifier and then cooling the mixture to 30°C before adding the other chemicals has a unique value because it eliminates the valve clogging problem that plaintiff asserts is present when the mixture is heated to other temperatures. Defendant presented three expert witnesses who testified that the specific temperatures used in the production of a depilatory make no difference in the quality of the product as long as the mixture is heated and cooled within a range of temperatures. Plaintiff's expert witness was Sam Rogers, who developed the method in issue and sold it to plaintiff. Rogers testified that after many experiments, he determined that 85°C was the best temperature to use.

During cross-examination on Rogers' background, defendant produced a membership application submitted by Rogers to the American Chemical Society which stated that he held degrees from M.I.T. and Northwestern University. Rogers admitted that he held no such degrees. He stated that he received an M.D. degree from the Kansas City College of Medicine and Surgery in 1942. The court then took judicial notice of a Missouri Supreme Court decision which affirmed the revocation of the charter of that school in 1926. Rogers testified on surrebuttal that he had been incorrect in his earlier testimony and that he had actually received his degree from the Kansas City University of Physicians and Surgeons in 1943 or 1944, and that his mother had lost his diploma from that school. The trial court remarked that the credibility of Rogers as to "anything other than what exactly he did in the performance of and perfection of his depilatory and ultimately selling it to plaintiff and his relationship with the Pittway-Barr Company has been destroyed, in my estimation, beyond rehabilitation."

■ Rogers was the only expert witness who stated that the specific temperatures used in preparing the depilatory were a critical factor in the performance of the product. Defendant's experts testified that the specific temperatures were unimportant, and it is undisputed that the use of the specific temperatures rather than a range of temperatures is the only difference between plaintiff's process and common industry practice. We hold that the trial court's finding that plaintiff's manufacturing procedure was not a protectable trade secret

was not against the manifest weight of the evidence.

Plaintiff's next contention is that the trial court erred in failing to find that a confidential relationship was created between the parties by Barr's receipt of the methods and processes, and that that relationship was breached by Barr's use of the manufacturing methods for clients other than plaintiff. Plaintiff asserts that this relationship existed apart from the secrecy agreement between the parties. The secrecy agreement provides that Barr's duty of nondisclosure shall terminate if the manufacturing method which was made a part of the agreement should become a matter of general knowledge in the industry. The trial court specifically found that the method was a matter of general knowledge at the time that Barr divulged it to others. Plaintiff essentially seeks to establish an implied duty of nondisclosure which is more far reaching than the duty which the parties made a part of their express contract. Barr's express duty of nondisclosure had terminated by the time it first used the production method for a client other than plaintiff. Any implied duty of nondisclosure would directly contradict the express agreement of the parties. We also note that matters of common knowledge cannot be transformed into trade secrets by labeling them as such in an agreement. (*Packard Instrument Co. v. Reich* (1980), 89 Ill. App. 3d 908, 917, 412 N.E.2d 617.) Thus, an express agreement which provided for a perpetual duty of nondisclosure would not have bound Barr to a duty not to disclose the methods and processes. Therefore, we hold that the trial court did not err in refusing to imply such a duty.

Plaintiff also contends that the trial court erred in failing to require that the authenticity of one of defendant's exhibits be "vindicated" before allowing it into evidence. The exhibit is a production sheet from Barr's labs which purports to show that Barr did not use plaintiff's process in producing a depilatory for Depilan, Ltd. The exhibit was first filed as part of Morris Root's affidavit in support of defendant's motion for summary judgment and was the subject of a petition filed by plaintiff to show cause why Root and Pittway Corporation should not be held in contempt. On August 20, 1975, the judge who was presiding over this cause prior to the eventual trial judge entered an order finding that the exhibit was a fabrication and holding Root and Pittway in contempt. On September 18, 1975, the same judge vacated the order. The order of vacation is not in the record, but is was presumably entered in response to defendant's motion to vacate which was filed on September 11, 1975. That motion was supported by affidavits which stated that no intentional alterations were made to the exhibit by defendants. In the September 18 order, the

judge also granted defendant's motion for change of venue. That motion was based on defendant's asserted inability to receive a fair trial due to the extreme prejudice of the judge to whom the case was assigned at that time.

■ Plaintiff argues that because of the unusual history of the exhibit, the trial court should have stringently tested its authenticity before receiving it into evidence. Plaintiff cites no appropriate authority in support of the proposition that the exhibit should have been "vindicated." It is well settled that the admission of evidence is largely within the discretion of the trial judge, and his decision will be disturbed only when that discretion has been clearly abused. (*Cratsley v. Commonwealth Edison Co.* (1976), 38 Ill. App. 3d 55, 59, 347 N.E.2d 496.) The trial court was not bound by the vacated order which declared the exhibit to be a fabrication, and plaintiff objects to the exhibit on no other grounds. We also note that no prejudice to plaintiff resulted from the admission of the exhibit. The trial court's holding was based on a finding that plaintiff's process was not a trade secret; no part of the judgment was premised on a finding that Barr did not use or disclose the process. We hold that the trial court did not abuse its discretion in receiving the exhibit into evidence.

Plaintiff also contends that the trial court committed an abuse of discretion by allowing Peter Cade and Paul Sanders to testify as expert witnesses.

A witness may testify as an expert if he possesses specialized knowledge which will assist the trier of fact. (See *Taylor v. Carborundum Co.* (1969), 107 Ill. App. 2d 12, 18-19, 246 N.E.2d 898.) This knowledge may be acquired by skill, experience, training, education, or otherwise. See *Stanley v. Board of Education* (1973), 9 Ill. App. 3d 963, 973, 293 N.E.2d 417.

In the instant case, both of the witnesses complained of testified on the issue of whether the use of specific temperatures rather than a range of temperatures, in the production of an aerosol foam depilatory, makes any difference in the quality of the resultant product. Paul Cade was the director of research of the company which produced the emulsifier used in "Gone." The duties of his employment included troubleshooting for customers and instructing them in the proper uses of the emulsifier. He had been performing these duties for 12 years at the time he testified. Paul Sanders was a recognized expert on aerosol technology. He was the author of two books on the subject and the recipient of several professional awards. He was familiar with aerosol foam depilatories that used the same ingredients which were contained in "Gone." Plaintiff's trial counsel stipulated to

his qualifications.

■ The essence of the testimony of both witnesses was that the specific temperatures used to heat and cool the depilatory formula made no difference in the quality or performance of the product. In light of the experience of the witnesses with the product involved and its ingredients, we cannot say that the trial court abused its discretion in allowing them to testify as experts.

Plaintiff's next assignment of error is that the trial court should not have permitted defendant's trial counsel to testify as a witness without requiring him to withdraw from the case. The circumstances surrounding defense counsel's testimony are as follows: In the latter stages of the lengthy trial of this case, Sam Rogers testified that he had met with defendant's counsel during the pendency of the litigation, and that during that meeting defendant's counsel offered him a "substantial" amount of money to testify for defendant. After hearing argument, the trial court allowed defendant's counsel to testify to that conversation without withdrawing as trial counsel. Defendant's counsel testified shortly before closing arguments, and stated that he had interviewed Rogers and had told Rogers that he would receive an appropriate expert witness fee if he did in fact qualify as an expert and if the defense decided to call him, but that no other offer of money was ever made to Rogers.

■ The testimony of an attorney in a case that he is trying should be allowed only when the court, in its discretion, deems it necessary. (*Cannella v. Cannella* (1971), 132 Ill. App. 2d 889, 893, 270 N.E.2d 114.) Rule 5–102(a) of the Illinois Code of Professional Responsibility (79 Ill. 2d R. 5–102(a)) provides that an attorney may testify without withdrawing from the case when his withdrawal would "work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case." (79 Ill. 2d R. 5–101(b)(4).) American Bar Association Committee on Ethics and Professional Responsibility Formal Opinion 339, issued January 31, 1975, states that one of the situations in which an attorney may properly testify without withdrawing is where a complex suit has been handled for a long period of time by that attorney when an unanticipated development makes the attorney's testimony necessary. An attorney may testify without withdrawing when surprise testimony is given which only the attorney can rebut. See *Cannella v. Cannella* (1971), 132 Ill. App. 2d 889, 893.

■ This trade-secret case, replete with technical testimony and exhibits, proceeded in the circuit court for seven years between the time the complaint was filed and the time defense counsel offered his

testimony. Defense counsel had conducted defendant's case from the pleading stage to trial, and to deprive defendant of counsel familiar with the case in mid-trial because of Roger's allegations would have been extremely prejudicial to defendant. It should also be noted that the testimony of an attorney who is involved in the trial of the case is not incompetent or inadmissible because of the attorney's involvement with the case, although that factor goes to the weight to be accorded the testimony. (*Manion v. Chicago, Rock Island & Pacific Ry. Co.* (1956), 12 Ill. App. 2d 1, 23, 138 N.E.2d 98.) Plaintiff does not contend that defense counsel's testimony was accorded improper weight by the court. Plaintiff simply asserts that it was prejudiced by the court's failure to require withdrawal. We hold that the trial court's decision to allow defense counsel to conclude the trial of this case did not deny plaintiff a fair trial.

■ Plaintiff's final contention is that it was deprived of a fair trial because plaintiff's trial counsel, now deceased, was too ill during trial to present plaintiff's case adequately, and that a new trial should be granted for that reason. The factual support for this contention is little more than a bare assertion, and no authority is cited for the proposition that a civil judgment may be reversed because of a party's dissatisfaction with its chosen attorney. It has been held that it is an abuse of discretion to allow a motion for a new trial in a civil case when the basis of the motion is inadequacy of counsel for the losing party. (See *Matyskiel v. Bernat* (1967), 85 Ill. App. 2d 175, 181, 228 N.E.2d 746.) Plaintiff does not contend that any theory or claim was not presented to the trial court, but only that its case could have been presented better. We find this contention to be meritless.

For the reasons stated herein, the judgment of the trial court is affirmed.

Affirmed.

PERLIN and HARTMAN, JJ., concur.