**ECOLOGIX, INC., a Pennsylvania corporation, Plaintiff,**

v.

**FANSTEEL, INC., a Delaware corporation, Defendant.**

**No. 87 C 9627.**

United States District Court, N.D. Illinois, E.D.

Jan. 15, 1988.

Leland P. Schermer, Bruce H. Wertzman, McDermott, Will & Emery, Chicago, Ill., Stanley M. Stein, Feldstein, Grinberg, Stein & McKee, Pittsburgh, Pa., for plaintiff.

William F. Mahoney, Jeffrey Singer, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION
## AND ORDER

ALESIA, District Judge.

Plaintiff, Ecologix, Inc. ("Ecologix"), has filed a four-count amended complaint against defendant, Fansteel, Inc. ("Fansteel"). In its amended complaint, Ecologix seeks declaratory and injunctive relief, as well as damages, for Fansteel's alleged breach of contract, breach of a confidential relationship, breach of fiduciary duties, and misappropriation of confidential, proprietary information and trade secrets. Jurisdiction is predicated upon diversity of citizenship, 28 U.S.C. § 1332, and the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201–02. This matter comes before the Court on Ecologix's motion for a temporary restraining order barring Fansteel from divulging certain information Fansteel obtained during the course of its dealings with Ecologix on two different projects. For the reasons set forth below, this Court denies Ecologix's motion.

## I. FACTUAL BACKGROUND

Ecologix is a Pennsylvania corporation with its principal place of business in Cranberry Township, Pennsylvania. Ecologix is engaged in the business of providing metal finishing and related systems to industry. Metal finishing includes the chemical milling of metals for the aircraft industry. Fansteel is a Delaware corporation with its principal place of business in North Chicago, Illinois. Fansteel is engaged in the business of contracting with airplane engine manufacturers to provide various parts for airplanes, including airplane engine parts. This suit arises from the parties' dealings on two different projects: one known as "the chemical milling facility project," and the other known as "the Tech Mod project."

### The Chemical Milling Facility Project

In early April of 1986, representatives of Ecologix and Fansteel commenced a series of discussions regarding the development, design, and construction management by Ecologix of a chemical milling facility for Fansteel ("the chemical milling facility project"). According to Ecologix, during their initial meeting and numerous subsequent meetings, the parties reached a mutual agreement to maintain the confidentiality of certain information which would be exchanged in connection with the chemical milling facility project. Fansteel disputes that it ever entered into any such agreement with Ecologix.

Ecologix also submitted two written proposals to Fansteel in connection with the chemical milling facility project. Proposal No. 600406, dated April 21, 1986, consisted of approximately 27 pages. Several terms of the proposal are relevant to this dispute. First, the proposal provided that Ecologix was to be paid on an hourly basis for the development of pilot testing, process engineering, and design engineering. Second, the proposal provided that Ecologix was to serve as the construction manager and equipment purchaser for Fansteel. Third, the proposal contained a provision designating certain information of Ecologix as "confidential" and requiring Fansteel to insure the non-disclosure of such information by having all of its employees to whom such information would be disclosed sign a non-disclosure agreement. Finally, the proposal included a "Confidentiality/Acceptance Statement" which requested that Fansteel execute the proposal and return it, along with Fansteel's purchase order, to Ecologix. Ecologix also submitted to Fansteel a second proposal, No. 600416, dated December 15, 1986. The second proposal essentially mirrored the terms of the first except for revised dollar estimates.

Fansteel never executed either proposal submitted by Ecologix, nor did it ever execute any other writing in which it agreed to accept the terms proposed by Ecologix. Although the parties engaged in ongoing discussions regarding various matters, Ecologix never followed through with its demands by securing Fansteel's signature on either of the proposals or by securing written non-disclosure agreements signed by Fansteel employees.

On June 17, 1986, Fansteel submitted its first purchase order to Ecologix. The face of the purchase order indicated that it was

issued to cover "process development/pilot testing" for the chemical milling facility. The reverse side of this purchase order, as well as all purchase orders Fansteel submitted to Ecologix thereafter, contained several provisions governing the parties' rights and claims to any confidential or technical information exchanged by the parties.

Paragraph 14 of the "Terms and Conditions of Purchase" provided:

TECHNICAL INFORMATION DISCLOSED TO [FANSTEEL]: [Ecologix] agrees not to assert any claim with respect to any technical information which [Ecologix] shall have disclosed or may hereafter disclose to [Fansteel] in connection with the goods or services covered by this order.

Paragraph 10 of the "Terms and Conditions of Purchase" provided:

CONFIDENTIAL INFORMATION: [Ecologix] agrees it will hold in confidence information pertaining to equipment, tools, gauges, patterns, designs, drawings, engineering data, and any other technical or proprietary information furnished by [Fansteel] either orally or in writing. [Ecologix] further agrees it will use such information only for the purpose of quoting to, or fabricating for, [Fansteel] the items covered hereby and for no other purpose.

Paragraph 1 of the "Terms and Conditions of Purchase" provided:

ACCEPTANCE: By acceptance of this order [Ecologix] agrees that any provisions appearing on [Ecologix's] acknowledgement or other form of acceptance which are inconsistent with, or in addition to, the terms and conditions herein stated are of no force and effect, and that the terms and conditions herein contained govern the entire transaction of sale and the contracts between the parties. Any waiver, alteration or modification of the terms and conditions of this order, to be valid, must be in writing and signed on behalf of [Fansteel] by its Purchasing Agent.

Ecologix received the initial purchase order containing this language and designat-ed Norman Higginbotham, an Ecologix employee, to review the terms and conditions appearing on the reverse side. After reviewing those terms and conditions, Higginbotham prepared an interoffice memorandum to John Scott, another Ecologix employee, outlining those provisions which Higginbotham deemed objectionable. That memorandum, dated July 16, 1986, suggested that paragraphs 14 and 10 of Fansteel's purchase order contained objectionable language. Yet, Ecologix never obtained a written modification of paragraphs 14 and 10 signed by Fansteel's Purchasing Agent, as required by paragraph 1 of the terms and conditions appearing on the reverse side of the purchase orders. Instead, Ecologix claims that it called these objectionable items to Fansteel's attention during a meeting on July 23, 1986 and secured an oral waiver or modification of these terms from Fansteel.

On four subsequent occasions, Fansteel issued three purchase orders and a change order to Ecologix. In each of these documents, paragraphs 14, 10 and 1 appeared as they originally had in the initial purchase order dated June 17, 1986. However, Ecologix neither obtained a written modification of these purchase orders, nor redacted the objectionable portions of the purchase orders. Instead, Ecologix accepted payments totalling almost $800,000.00 for work performed pursuant to the terms of these purchase orders.

### The Tech Mod Project

In early July of 1986, representatives of Ecologix and Fansteel met to discuss whether Ecologix would be interested in providing technical assistance to Fansteel for the development of a Fansteel bid proposal to a United States Air Force defense contractor, Pratt & Whitney. Fansteel sought to obtain a subcontract with Pratt & Whitney in connection with a Technical Modernization program ("the Tech Mod project") sponsored by the United States Air Force.

According to Ecologix, before it agreed to provide technical information for the Tech Mod project, it secured an oral agree-

ment from Fansteel and Pratt & Whitney to maintain the confidentiality of all information furnished by Ecologix. The parties allegedly consummated this oral agreement during a meeting between representatives of Ecologix and Fansteel on July 3, 1987, and during a subsequent meeting among representatives of Ecologix, Fansteel, and Pratt & Whitney at the end of July, 1987. Ecologix claims that all parties at these meetings also acknowledged Ecologix's proprietary rights to the technical information it agreed to provide. Fansteel disputes that the parties ever reached such an agreement.

The parties agree that Ecologix subsequently provided Fansteel with certain technical information and that Fansteel, in turn, paid Ecologix. The technical information provided by Ecologix was embodied in the technical volume of Fansteel's multi-volume, written bid proposal to Pratt & Whitney. The president of Ecologix personally assisted Fansteel employees in drafting the technical volume of Fansteel's bid proposal at Fansteel's office.

Yet, the technical volume of Fansteel's bid proposal contained no language protecting Ecologix's alleged proprietary rights or preserving the confidentiality of the information provided by Ecologix. Instead, the technical volume contained language which expressly provided that the United States Air Force would obtain all proprietary rights to the information generated by the Tech Mod project if Fansteel's bid proposal was accepted.

In October of 1987, Ecologix learned that Fansteel intended to contact competitors of Ecologix to solicit from them competitive bids in connection with the Tech Mod project. Believing that it was entitled to perform whatever additional work would be required by Fansteel if it were awarded the Pratt & Whitney subcontract, and also believing that its confidential, proprietary information and trade secrets had been wrongfully divulged by Fansteel to a competitor, Ecologix filed its motion for a temporary restraining order.

## II. DISCUSSION

■ Ecologix bears the burden of establishing the five requirements necessary for the issuance of a temporary restraining order: (1) that it stands a reasonable likelihood of success on the merits; (2) that it has no adequate remedy at law; (3) that it will suffer irreparable harm without injunctive relief; (4) that the irreparable harm it will suffer absent injunctive relief outweighs the irreparable harm Fansteel will suffer if the injunctive relief is granted; and (5) that the injunctive relief will not disserve the public interest. *Baja Contractors, Inc. v. The City of Chicago*, 830 F.2d 667, 675 (7th Cir.1987); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir.1984).

In this case, our discussion will focus primarily on Ecologix's likelihood of success on the merits since we believe it to be the pivotal factor.

1. Reasonable Likelihood of Success on the Merits

Ecologix predicates its likelihood of success in this case on the merits of four legal claims: breach of an oral contract; breach of a confidential relationship; breach of fiduciary duties; and, misappropriation of confidential proprietary information and trade secrets. In this Court's opinion, Ecologix does not stand a reasonable likelihood of prevailing on the merits of any of these four claims. We examine each of them in turn.

a. *Breach of an Oral Contract*

Ecologix has demonstrated a creative flair in setting forth its breach of contract claim. Initially, Ecologix asserted that it was the third-party beneficiary of an as yet non-existent contract between Fansteel and Pratt Whitney on the Tech Mod project. When questioned about this novel theory by the Court during the hearing, however, Ecologix's counsel retreated from this theory and shifted positions. In a classic case of hindsight, Ecologix recast its oral contract theory and claimed that during a series of discussions, Ecologix and Fansteel had entered into a valid, enforceable oral agreement to mutually maintain the confi-

dentiality of all information exchanged between them on the chemical milling facility project and the Tech Mod project. The evidence adduced at trial, however, simply does not support the existence of an oral contract.

 In order to establish the existence of an enforceable oral contract, one must demonstrate three essential elements: (1) an offer; (2) an acceptance; and (3) consideration to support the formation of a legally enforceable agreement. *Taylor v. Gordon Flesch Co., Inc.*, 793 F.2d 858, 862 (7th Cir.1986). In addition, the terms of the contract must be reasonably certain and reasonably ascertainable from the acts and words of the parties. *Id.*

 In this case, Ecologix has failed to meet its burden of proving all of these elements. It is true that Ecologix's oral and written proposals to maintain the confidentiality of whatever information was exchanged could constitute a viable offer; however, an offer, standing alone, does not suffice to create a contract. There must also be an acceptance. And that is where Ecologix's proof fell far short of the mark.

While Ecologix presented evidence that it made an offer (both orally and in writing), it presented no credible evidence that Fansteel ever accepted the offer. Ecologix correctly points out that acceptance of an oral contract may be manifested "wholly or partly by written or spoken words or by other acts or by failure to act." Restatement Second of Contracts, § 19(1) (1979). Instead of bolstering Ecologix's oral contract claim, however, application of this principle defeats it.

Indeed, the credible evidence elicited at the hearing reveals that neither party acted in a manner consistent with the terms of the purported oral contract. Ecologix's own conduct is illustrative. As borne out by the testimony of its own witnesses, it was the custom and practice of Ecologix to routinely require all third parties to whom it would divulge confidential information to sign a non-disclosure agreement. That Ecologix undertook to memorialize this policy and incorporate it as a standard pre-printed term and condition of its written proposals underscores the significance of this policy to Ecologix. Although Ecologix submitted to Fansteel two such written proposals containing this language, Ecologix never secured signed non-disclosure agreements from numerous individuals to whom Ecologix divulged this confidential information, or to whom Ecologix could anticipate such information would be divulged. On the chemical milling facility project, these individuals included a variety of Fansteel employees, as well as regulatory authorities and architects whom Ecologix consulted. On the Tech Mod project, these individuals included Fansteel employees, Pratt & Whitney employees, United States Air Force officials, an Arthur Young representative, and Leisure Care Enterprises employees. Nonetheless, Ecologix did demand that David Kamperman, a technical consultant Ecologix hired in connection with the Tech Mod Project, sign such an agreement. This selective enforcement of Ecologix's policy requiring third parties to sign non-disclosure agreements leads to the inescapable conclusion that Ecologix consciously deviated from its own established procedures for safeguarding confidential information—conduct certainly inconsistent with an oral non-disclosure agreement.

Fansteel's conduct likewise belies the existence of an oral non-disclosure agreement between the parties. Significantly, Fansteel never accepted either of the two written proposals Ecologix submitted in connection with the chemical milling facility project. Those proposals contained the language requiring all Fansteel employees to whom confidential information would be divulged to sign non-disclosure agreements. Nor did Fansteel ever sign a non-disclosure agreement in connection with the Tech Mod project. In this Court's opinion, Fansteel's failure to act, after being offered the opportunity to do so, constitutes telling evidence that it did not assent to the terms of the purported oral agreement.

The written documents generated as a result of the parties' interaction on these two projects are, perhaps, the most persuasive evidence that the parties failed to

consummate a valid, enforceable oral non-disclosure agreement in this case. During the course of the chemical milling facility project, Fansteel issued five separate purchase orders to Ecologix. None of those purchase orders embodied language protecting Ecologix's confidential information or confirming the parties' purported oral non-disclosure agreement. On the contrary, under the terms of paragraph 14 of each purchase order, Ecologix agreed *not* to assert any claims to technical information which it divulged to Fansteel in connection with the services covered by the purchase order. Furthermore, under the terms of paragraph 10 of each purchase order, Ecologix agreed to maintain the confidentiality of all technical or proprietary information supplied to it *by Fansteel.*

Ecologix attempts to repudiate the terms of these purchase orders with two equally meritless arguments. First, Ecologix asserts that the parties did not intend the purchase orders to function as written contracts; rather, the parties merely intended them to operate as a "funding mechanism." This argument is inherently fallacious. Ecologix cannot, at one moment, acknowledge the validity of the purchase orders by accepting approximately $800,000 pursuant to their terms and, then, later, renounce the purchase orders after deciding that certain terms are offensive or unfavorable to it. Such a position is logically untenable. It also lacks credibility in view of the testimony by two Ecologix employees that the purchase order was a document significant enough to warrant a thorough review of its terms.

Ecologix's second argument is similarly devoid of credibility. Ecologix argues that during a meeting between the parties in July of 1986, Fansteel orally agreed to modify paragraph 14 of the initial purchase order to comport with the purported oral non-disclosure agreement between the parties. Ecologix claims that after receiving and reviewing Fansteel's initial purchase order dated June 17, 1986, it detected the objectionable language in paragraph 14 and

negotiated this modification of its terms. The affidavits submitted by Fansteel, and admitted into evidence without objection, directly refute this assertion. In addition, Ecologix's failure to confirm this modification in writing after receiving the initial purchase order, as well as its subsequent acceptance, on four separate occasions, of purchase orders containing the identical objectionable language, renders this argument implausible. After hearing the evidence, this Court remains unconvinced that Fansteel orally agreed to vary the terms of the initial purchase order.

The final written document that discredits Ecologix's oral contract claim is the technical volume of Fansteel's bid proposal to Pratt & Whitney, which was generated in connection with the Tech Mod project. By its own terms, the technical volume provided that the United States Air Force would obtain all proprietary rights to the information generated by the Tech Mod project if Pratt & Whitney accepted Fansteel's bid proposal. By his own admission, the president of Ecologix, Jerry Penland, assisted Fansteel employees in drafting the technical volume and reviewed its terms. However, he not only failed to include a provision protecting Ecologix's proprietary rights, but also failed to object to a provision which so obviously jeopardized these rights and contradicted the purported oral contract between the parties. This conduct casts further doubt on the credence of Ecologix's oral contract claim.

In sum, this Court finds that the written documentation and the conduct of the parties constitute far more reliable and credible evidence of their intentions to enter into a valid, enforceable oral non-disclosure contract than the belated, sketchy, and evasive recollections of oral discussions testified to by Ecologix employees. Based upon our review, the credible evidence presented overwhelmingly establishes that Fansteel never accepted Ecologix's offer and that the parties never consummated an oral nondisclosure agreement.[1]

1. Since we have decided that Fansteel never accepted Ecologix's offer, we need not discuss

the final element of consideration.

#### b. *Breach of a Confidential Relationship*

■ Ecologix's second legal claim, labeled "breach of a confidential relationship," fares no better. As a threshold matter, this claim, in theory at least, is redundant. This Court discerns no practical difference between Ecologix's claim for breach of a confidential relationship (Count II) and its claim for misappropriation of confidential, proprietary information and trade secrets (Count IV). Upon close scrutiny, in both cases, it is the *misappropriation* of another's confidential information which renders the conduct an actionable tort. *See Smith v. Dravo Corp.*, 203 F.2d 369, 373 (7th Cir.1953) (where the court identified the cause of action as "the misappropriation of trade secrets obtained through breach of a confidential relationship"). Nonetheless, whichever label Ecologix uses to characterize its claim, it lacks merit, as more fully explained below in our discussion of the misappropriation claim [2].

#### c. *Breach of Fiduciary Duties*

■ Like Ecologix's oral contract claim, this claim underwent a metamorphosis during the course of the hearing. Initially, Ecologix's counsel likened the relationship between Ecologix and Fansteel to a relationship between joint venturers. Relying on this joint venture analogy, Ecologix argued that a fiduciary relationship arose during the course of the parties' business dealings and that it was breached when Fansteel disclosed to a third party certain information imparted as a result of the joint venture. When the Court pursued this line of argument with Ecologix's counsel, he retreated from this position [3].

Ecologix then contended that the purported oral nondisclosure agreement between the parties created a fiduciary relationship between them, which was breached by Fansteel's disclosure of the Tech Mod proposal to a third party. This Court, however, has already concluded that the parties never consummated such an oral agreement. Consequently, that agreement cannot form the basis for a fiduciary relationship in this case.

■ Nor can the concept of "commercial morality" give rise to a fiduciary relationship between the parties in this case, as urged by Ecologix. This concept, as its underlying premise, assumes wrongful use of secret or confidential information. *See ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 97–98, 273 N.E.2d 393, 398 (1971). In arguing that this concept should create a fiduciary relationship in this case, Ecologix overlooks one critical fact: that Fansteel paid Ecologix handsomely for the information at issue. This fact defeats Ecologix's claim for breach of fiduciary duty predicated upon "commercial morality."

Since Ecologix failed to otherwise adduce any evidence establishing the existence of a fiduciary relationship, this Court finds that no such relationship existed between Ecologix and Fansteel. Accordingly, in our opinion, like Ecologix's other claims, its claim for breach of fiduciary duties does not stand a reasonable chance of succeeding on its merits.

#### d. *Misappropriation of Confidential, Proprietary Information and Trade Secrets*

As its final ground for injunctive relief, Ecologix asserts that Fansteel misappropriated Ecologix's confidential proprietary information and trade secrets. In support of this claim, Ecologix submitted under seal voluminous documentation segregated into

---

**2.** This Court believes that the gravamen of Ecologix's claim is misappropriation and that the cause of action is more accurately labeled as such; therefore, we defer our discussion on the merits of this claim.

**3.** Under Illinois law, the party who asserts the existence of a joint venture bears the burden of proving its existence. In order to establish a "joint venture," one must prove the following: a

proprietary interest in the subject matter; a community of interest; a right to govern the policy in connection therewith; and a sharing of both profits and losses. *Palin Mfg. Co., Inc. v. Water Technology, Inc.*, 103 Ill.App.3d 926, 932, 59 Ill.Dec. 553, 558, 431 N.E.2d 1310, 1315 (1st Dist.1982). This Court holds, as a matter of law, that the evidence presented did not establish the existence of a joint venture.

a series of four exhibits.[4] According to Ecologix, all of these documents contain confidential, proprietary information and trade secrets belonging to Ecologix. This Court disagrees.

■ Under Illinois law, a "trade secret" is a plan or process, tool, mechanism, compound, or informational data known only to its owners and those employees to whom it must necessarily be confided. *ILG Industries*, 49 Ill.2d at 92, 273 N.E.2d at 395 (1971). In order to determine whether information constitutes a trade secret, the courts consider several factors: the extent to which the information is known outside of the business; the extent to which it is known by employees and others involved in the business; the extent of measures taken by the company to guard the secrecy of the information; the value of the information to the owner and its competitors; the amount of effort or money expended in developing the information; and, the ease or difficulty with which the information could be properly acquired or duplicated by others. *ILG Industries*, 49 Ill.2d at 93, 273 N.E.2d at 396 (quoting Restatement of Torts, 757, comment b, p. 6 (1939)).

■ An evaluation of each of these factors within the context of this case dictates the conclusion that the information submitted by Ecologix does not rise to the level of a trade secret. The record is replete with evidence that Ecologix did not treat this information confidentially. According to the testimony elicited at the hearing, Ecologix did not maintain this information under lock and key or place any special restrictions on its internal disclosure. Instead, Ecologix freely divulged this information to many of its own employees, as well as numerous individuals outside of its business.[5] In doing so, Ecologix not only failed to take routine measures to preserve the secrecy of any of this information, but also disregarded its own established policy for safeguarding confidential information. Ecologix employees conceded that they disseminated the information without securing signed non-disclosure agreements from any of these individuals, save one, though it was the established policy of Ecologix to do so on all projects.[6] That Ecologix did require one of its technical consultants on the Tech Mod project to sign such an agreement indicates that Ecologix's failure to require these numerous other individuals to do so was not an act attributable to neglect or carelessness; rather, it was a conscious decision. Obviously, both Ecologix and Fansteel rec-

---

4. The documents containing the alleged confidential, proprietary information and trade secrets of Ecologix are marked as Exhibits "A" through "D". To this Court's dismay, however, they do not appear to have been compiled in any logical order or sequence. Exhibit "A" consists of Ecologix's first chemical milling facility proposal (No. 600406), dated April 21, 1986, together with a cover letter. Exhibit "B" is Ecologix's Tech Mod proposal, along with the technical volume of Fansteel's bid proposal to Pratt & Whitney. Exhibit "C" is comprised of a series of nineteen drawings given to Fansteel by Ecologix with a transmittal letter dated September 23, 1987. Exhibit "D" includes a collection of documents, primarily engineering reports, presumably prepared by Ecologix for Fansteel. Parenthetically, we note that at least one of the documents in Exhibit "D" was marked "Confidential" by Ecologix. Under Illinois law, however, merely labeling information as confidential does not elevate it to the level of a trade secret. *See Andrea Dumon, Inc. v. Pittway Corp.*, 110 Ill.App.3d 481, 488, 66 Ill.Dec. 148, 153, 442 N.E.2d 574, 579 (1st Dist.1982), *petition for leave to appeal denied without opinion* (April 12, 1983).

5. Since the Court has already set forth in considerable detail the numerous individuals to whom Ecologix divulged this allegedly sensitive information, we need not recount the list here. We do note, however, that under Illinois law, unrestricted disclosure of such information to at least *one* third party on a completely non-confidential basis removes any indicia of secrecy necessary for proprietary information to be considered a trade secret and defeats any claim founded upon misappropriation of such information. *Crown Industries, Inc. v. Kawneer Co.*, 335 F.Supp. 749, 761 (N.D.Ill.1971).

6. Of all of the factors set forth, the extent of the measures taken to guard the secrecy of information is determinative. *See Palin Mfg. Co., Inc. v. Water Technology, Inc.*, 103 Ill.App.3d 926, 931, 59 Ill.Dec. 553, 557, 431 N.E.3d 1310, 1314 (1st Dist.1982). In this case, the Court believes that the evidence has overwhelmingly established that Ecologix failed to take even minimal measures to guard the secrecy of its allegedly confidential information.

ognized the value of this information since Fansteel paid Ecologix substantial sums of money for its efforts and Ecologix accepted these sums. All of this evidence, which refutes the existence of a trade secret, was uncontroverted.

In contrast, all of the evidence presented by Ecologix to support its claim that the information divulged to Fansteel contained trade secrets was sketchy, disputed, and inconsistent. The testimony presented by Ecologix pertaining to the purported oral agreement between the parties to treat this information as confidential was controverted by the affidavits of various Fansteel employees (admitted into evidence without objection), the conduct of the parties, and the written documentation generated in connection with both projects.[7] During the hearing, this Court enjoyed the unique opportunity of observing the demeanor of Ecologix employees while giving this testimony. In our opinion, during their testimony, all of Ecologix's witnesses skirted the thin line between equivocation and evasion on most disputed issues of fact.

The testimony elicited by Ecologix regarding the contents of the documents claimed as confidential was equally equivocal. When pressed to identify which items in each of the four exhibits submitted under seal Ecologix deemed confidential, Jerry Penland, the president of Ecologix, vacillated. Initially, he intimated, based on his understanding of the purported oral agreement, that the contents of all four exhibits in their entirety contained confidential, proprietary information and trade secrets of Ecologix. On cross-examination, however, Penland qualified, and even contradicted, his original testimony. For example, although Ecologix submitted the entire contents of its initial bid proposal to Fansteel on the chemical milling facility project (Exhibit A) as a trade secret, Penland admitted that the only portion of this document he considered to be proprietary or secret was the information reflecting the dollar estimates for performing the proposed work. Likewise, while Ecologix originally claimed

as confidential the entire contents of the Tech Mod proposal (Exhibit B), Penland conceded that only certain portions he had personally highlighted in green contained secret or proprietary information. On cross-examination, he retreated a bit further from this testimony and admitted that even some of the highlighted portions of the document did not constitute secret or proprietary information. Yet, moments later, he contradicted himself by testifying that he considered the entire document worthy of protection.

This testimony merely represents a sample of the type of testimony upon which Ecologix relied to substantiate its claim that this information was a trade secret; the record abounds with other examples. When weighed against the other uncontroverted evidence, however, this testimony is inherently suspect. Based on our review of the credible evidence, we are not convinced that the information at issue was, in fact, a trade secret.

 Nor are we convinced that Fansteel misappropriated this information, as claimed by Ecologix. On the contrary, the evidence established that Fansteel purchased and paid for the information and that Ecologix accepted payment under the terms of Fansteel's purchase orders and Ecologix's invoices. Since Ecologix has not presented credible evidence to sustain its misappropriation claim or any of its other claims, it does not stand a slim, much less reasonable, chance of succeeding on the merits.

## 2. Inadequate Remedy at Law

Ecologix claims that it lacks an adequate remedy at law because disclosure of its confidential information and trade secrets will jeopardize its proprietary rights to such information, as well as its pending patent application. This Court, however, has determined that Ecologix failed to prove that its information was confidential and proprietary. Accordingly, Ecologix's contention that its loss of proprietary rights to this information renders its legal

---

**7.** Again, this Court has already discussed at length the nature of the parties' conduct and the

written documentation. We need not repeat that discussion here.

remedy inadequate is not supported by the evidence.

As for its pending patent application, Ecologix has jeopardized its own rights. As we have pointed out, Ecologix consciously failed to follow its own established procedures for safeguarding the secrecy of its information. If Ecologix had truly desired to secure patent protection for this information, it could have done so before the eleventh hour. This Court will not allow Ecologix to capitalize on its own dilatory conduct and thereby penalize Fansteel. Ecologix has neither demonstrated that it deserves a remedy at all, nor established that it has an inadequate legal remedy.

### 3. Irreparable Harm

Ecologix's claim of irreparable harm rises and falls with its claim of an inadequate legal remedy. Essentially, Ecologix asserts that absent injunctive relief, its proprietary rights to this "unique and irreplaceable" information will be impaired. This assertion was simply not borne out by the evidence presented.

On the contrary, the evidence showed that Ecologix supplied valuable information to Fansteel and Fansteel compensated Ecologix for doing so. The parties had a vendor/vendee relationship. Ecologix otherwise acted at its own peril on nothing more than a wishful expectation that Pratt & Whitney would be awarded the United States Air Force contract and that Ecologix would, in turn, win a secondary subcontract from Fansteel. When Ecologix's hopes were dashed, it attempted to transform its wishful expectations into an enforceable contract. Despite these attempts, Ecologix has failed to establish irreparable harm.

### 4. Balancing the Hardships

In this case, the balance of the hardships weighs in favor of denying the motion for a temporary restraining order. As set forth

above, Ecologix has failed to establish a protectible interest in the information obtained by Fansteel. Ecologix sold this information to Fansteel for a substantial sum of money. With the benefit of hindsight, Ecologix now pleads hardship, claiming that the sums it received from Fansteel represented compensation for Ecologix's assistance, not the technical information. This Court disagrees and finds that Ecologix has not adequately demonstrated that it will suffer hardship in the absence of a temporary restraining order.

In marked contrast, issuance of a temporary restraining order will impose hardship upon Fansteel. If this Court grants injunctive relief, Fansteel will be effectively foreclosed from using valuable information for which it expended substantial sums of money. In effect, Fansteel will have been shortchanged approximately $800,000.00 for unusable information.

Ecologix overlooks this fact and instead focuses on the fact that Fansteel submitted affidavits, rather than presented live testimony, to discredit Ecologix's claims. We note that Ecologix's counsel never objected to the admission of Fansteel's affidavits into evidence. Thus, Ecologix cannot now cloud the record by arguing that Fansteel's failure to adduce live testimony was tantamount to an admission that it would sustain no hardship. The credible evidence—the conduct of the parties and the documentation—betrays the obvious. Fansteel's hardship, in the event a temporary restraining order were to issue, clearly outweighs Ecologix's hardship, if any, in the event injunctive relief is not granted.

### 5. Public Interest

In this case, the Court finds that denial of injunctive relief will serve the public interest in two respects. First, denial of a temporary restraining order will promote competitive bidding on governmental contracts and subcontracts.[8] This fosters the public interest by ensuring that work per-

---

**8.** Incidentally, the Court takes note of the testimony of Jerry Penland, president of Ecologix, wherein he described the Tech Mod program. This testimony confirms that the whole purpose of the Tech Mod program was to provide an incentive to companies which manufacture various parts for the United States Air Force to upgrade or modernize technology relating to those parts so as to *lower overall costs to the government.*

formed pursuant to governmental contracts is accomplished in the most economical and efficient fashion possible.

Second, denial of injunctive relief will not only encourage contracting parties to carefully delineate and memorialize the terms of their agreements or face the consequences later, but will also inspire individuals to preserve genuine proprietary rights to confidential information or trade secrets by taking adequate precautionary measures to safeguard such information.

The Court, based on the credible evidence of record, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Ecologix, Inc. is a Pennsylvania corporation with its principal place of business in Cranberry Township, Pennsylvania. Ecologix is engaged in the business of providing metal finishing and related systems to industry.

2. Fansteel, Inc. is a Delaware corporation with its principal place of business in North Chicago, Illinois. Fansteel is engaged in the business of contracting with airplane engine manufacturers to provide various parts for airplanes, including airplane engine parts.

3. In early April of 1986, representatives of Ecologix and Fansteel commenced a series of discussions regarding the development, design and construction management by Ecologix of a chemical milling facility for Fansteel.

4. During these discussions, representatives of Fansteel never orally agreed to maintain in confidence the documents submitted under seal to this court and marked as Exhibits "A" through "D".

5. Ecologix submitted to Fansteel two written proposals, dated April 21, 1986 and December 15, 1986, respectively, in connection with the chemical milling facility project. Both of these proposals contained language designating certain information of Ecologix as "confidential" and requiring Fansteel to insure the non-disclosure of "confidential" information by having all of its employees to whom such information would be disclosed sign a non-disclosure agreement. Both of these proposals also included a "Confidentiality/Acceptance Statement" which requested that Fansteel execute the proposal and return it, along with Ecologix's purchase order, to Ecologix.

6. Fansteel never executed either proposal or any other writing indicating that it accepted the terms of either proposal.

7. Fansteel employees to whom Ecologix disclosed information never executed non-disclosure agreements in accordance with the terms of Ecologix's written bid proposals.

8. Between June 17, 1986 and December 16, 1986, Fansteel submitted four purchase orders and a change order to Ecologix. All of these purchase orders, on their reverse side, contained identical terms governing the parties' rights and claims to any confidential or technical information exchanged by the parties.

9. Paragraph 14 of the reverse side of each purchase order provided:

TECHNICAL INFORMATION DISCLOSED TO [FANSTEEL]: [Ecologix] agrees not to assert any claim with respect to any technical information which [Ecologix] shall have disclosed or may hereafter disclose to [Fansteel] in connection with the goods or services covered by this order.

10. Paragraph 10 of the reverse side of each purchase order provided:

CONFIDENTIAL INFORMATION: [Ecologix] agrees it will hold in confidence information pertaining to equipment, tools, gauges, patterns, designs, drawings, engineering data, and any other technical or proprietary information furnished by [Fansteel] either orally or in writing. [Ecologix] further agrees it will use such information only for the purpose of quoting to, or fabricating for, [Fansteel] the items covered hereby and for no other purpose.

11. Paragraph 1 of the reverse side of each purchase order provided:

ACCEPTANCE: By acceptance of this order [Ecologix] agrees that any provi-

sions appearing on [Ecologix's] acknowledgement or other form of acceptance which are inconsistent with, or in addition to, the terms and conditions herein stated are of no force and effect, and that the terms and conditions herein contained govern the entire transaction of sale and the contracts between the parties. Any waiver, alteration or modification of the terms and conditions of this order, to be valid, must be in writing and signed on behalf of [Fansteel] by its Purchasing Agent.

12. Ecologix received each of the five purchase orders.

13. Representatives of Ecologix reviewed the terms contained in Paragraphs 14, 10, and 1 and recognized their significance.

14. Representatives of Fansteel never agreed in writing to modify the terms of Paragraphs 14, 10 and 1 of the purchase orders.

15. Representatives of Fansteel never orally agreed to waive or modify the terms of Paragraph 14, 10, and 1 of the purchase orders.

16. Ecologix accepted approximately $800,000.00 from Fansteel for information provided and services performed pursuant to the terms of the purchase orders.

17. In early July of 1986, representatives of Ecologix and Fansteel met to discuss whether Ecologix would be interested in providing technical assistance to Fansteel for the development of a Fansteel bid proposal to a United States Air Force defense contractor, Pratt & Whitney. Fansteel sought to obtain a subcontract with Pratt & Whitney in connection with a Technical Modernization program sponsored by the United States Air Force.

18. Ecologix agreed to provide technical information and assistance to Fansteel in connection with the Tech Mod project.

19. The technical information provided by Ecologix was embodied in the technical volume of Fansteel's multi-volume, written bid proposal to Pratt & Whitney.

20. Jerry Penland, the president of Ecologix, personally assisted Fansteel employees in drafting the technical volume of Fansteel's bid proposal at Fansteel's offices. Penland also read and reviewed the final written draft of the technical volume of Fansteel's written bid proposal.

21. The technical volume of Fansteel's written bid proposal contained no language protecting proprietary rights of Ecologix or preserving the confidentiality of the information provided by Ecologix.

22. The technical volume of Fansteel's written bid proposal contained language which provided that the United States Air Force would obtain all proprietary rights to information generated by the Tech Mod project if Fansteel's bid proposal was accepted. Ecologix never objected to this language, nor asked that it be modified to protect any of Ecologix's proprietary rights or preserve any of Ecologix's confidential, proprietary information or trade secrets.

23. It was the established custom and practice of Ecologix on all of its projects to require all third parties to whom confidential information would be divulged to sign pre-printed, non-disclosure agreements.

24. Ecologix required David Kamperman, a technical consultant Ecologix hired in connection with the Tech Mod project, to sign a pre-printed, non-disclosure agreement.

25. Ecologix never secured signed non-disclosure agreements from numerous other individuals to whom Ecologix divulged information it deemed confidential, or to whom Ecologix could anticipate such information would be divulged. On the chemical milling facility project, these individuals included a variety of Fansteel employees, as well as regulatory authorities and consultants whom Ecologix consulted. On the Tech Mod project, these individuals included Fansteel employees, Pratt & Whitney employees, United States Air Force officials, an Arthur Young representative, and Leisure Care Enterprises employees. Ecologix's failure to secure such signed, non-disclosure agreements was a conscious decision.

26. Fansteel never signed a non-disclosure agreement in connection with the Tech Mod project.

27. Fansteel paid Ecologix on an hourly basis for the technical information and assistance provided by Ecologix in Fansteel's bid proposal to Pratt & Whitney on the Tech Mod project.

28. Ecologix accepted payment from Fansteel for the technical information and assistance provided by Ecologix on Fansteel's bid proposal to Pratt & Whitney on the Tech Mod project.

29. Ecologix divulged the information it considered confidential to many of its own employees, as well as numerous individuals outside of its business.

30. Ecologix did not maintain the information it considered confidential under lock and key or place any special restrictions on its internal disclosure.

31. Ecologix failed to follow routine measures to preserve the secrecy of the information it considered confidential.

32. Ecologix and Fansteel both recognized the value of the information and assistance provided by Ecologix on the two projects.

33. The testimony of Ecologix's witnesses on all disputed issues of fact was not credible, but was equivocal, evasive, and inconsistent.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. §§ 2201–02.

2. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b) and (c).

3. The law of the State of Illinois governs the substantive issues raised in this action. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

4. Under Illinois law, Ecologix has failed to establish the essential elements of an oral contract between Ecologix and Fansteel. *Taylor v. Gordon Flesch Co.,* 793 F.2d 858 (7th Cir.1986).

5. Ecologix has failed, as a matter of law, to adduce any evidence establishing the existence of a fiduciary or confidential relationship between Ecologix and Fansteel.

6. The documents submitted under seal to this Court by Ecologix as Exhibits "A" through "D" do not constitute confidential, proprietary information or trade secrets worthy of protection under Illinois law. *ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 273 N.E.2d 393 (1971).

7. Ecologix has failed to establish the essential elements of a claim for misappropriation of trade secrets under Illinois law. *Smith v. Dravo Corp.,* 203 F.2d 369 (7th Cir.1953).

8. Ecologix has not sustained its burden of proving a reasonable likelihoood of success on the merits. *Baja Contractors, Inc. v. The City of Chicago,* 830 F.2d 667, 675 (7th Cir.1987); *Taylor v. Gordon Flesch Co.,* 793 F.2d 858 (7th Cir.1986); *ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 273 N.E.2d 393 (1971).

9. Ecologix has failed to meet its burden of proof on its motion for a temporary restraining order. *Baja Contractors, Inc. v. The City of Chicago,* 830 F.2d 667, 675 (7th Cir.1987); *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984).

## DECISION

The motion for a temporary restraining order of the Plaintiff, Ecologix, Inc., is DENIED.

IT IS SO ORDERED.